AARON BERMAN, DOING BUSINESS AS BERMAN STEEL CO., APPELLEE AND CROSS-APPELLANT, v. THE UNITED STATES NATIONAL BANK, A NATIONAL BANKING CORPORATION, APPELLANT AND CROSS-APPELLEE.

249 N. W. 2d 187

Filed December 29, 1976.   No. 40358.

Robert C. Doyle of Morsman, Fike, Davis & Polack, and David J. Lanphier of McGill, Koley & Parsonage, for appellant.

Keith I. Frederick for Schmid, Ford, Mooney, Fred-

erick & Caporale, and Elmer Pybrum for Brunsky, Pybrum, Skemp & Ebey, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, and CLINTON, JJ., and COLWELL, District Judge.

CLINTON, J.

This is an action in seven causes against the defendant, The United States National Bank of Omaha (herein called "Bank"), brought by the plaintiff Berman, a dealer in metals and the payee of five drafts given by Aaron Ferer & Sons Co., another metal dealer, to Berman in payment of a number of carloads of metal sold by Berman to Ferer. The grounds of the first five causes of action were that the Bank failed to honor and pay the drafts when presented and failed to give timely notice of dishonor and nonpayment. The basis of the sixth cause was that, because of the failure of the Bank to give notice of dishonor of the five above-mentioned instruments, Berman was prevented from stopping shipment of a sixth purchase of metal for which payment had not been made and for which no draft was received. The seventh cause prayed for consequential damages on account of injuries to the health of Berman caused by the Bank's alleged bad faith refusal to pay the instruments described in the first five causes.

At the close of Berman's case the trial court sustained the motion of the Bank for dismissal of the seventh cause. At the close of all the evidence the court sustained the motion of the Bank for a directed verdict on the sixth cause and granted Berman's motion for a directed verdict on causes 1 through 5 for the amount of the drafts less the value of two carloads of metal which Berman was able to retrieve.

### The Issues and Conclusions

The Bank appeals and makes three assignments of error. First, the trial court erred in directing the verdict for Berman on the first five causes. Second, the

court erred in admitting into evidence a certain clearing agreement between the Federal Reserve Bank, Omaha Branch, the defendant Bank, and certain other Omaha banks. Third, the court erred in refusing to receive the testimony of one Paul Yahnke, an employee of the Bank, whose name had been omitted by the Bank in its answer to Berman's interrogatories requesting the names of prospective witnesses.

The plaintiff cross-appeals, claiming the court erred in dismissing his sixth and seventh causes of action.

On the direct appeal the principal questions argued are whether the Bank was a collecting bank under the provisions of sections 3-120 and 4-105(d), U.C.C., whose obligation was limited to an exercise of reasonable care in the performance of functions and duties imposed upon it as a collecting bank by the Uniform Commercial Code and whose liability is only for the amount of the items handled, less any amount which could have been recovered by Berman in the use of ordinary care, or whether its status is that of a payor bank under section 4-105(b), U.C.C., making it accountable and liable for the face amount of the items by reason of having failed to return them within the time prescribed by law and for having failed to give notice of dishonor or nonpayment within the time prescribed by law. Alternatively, Berman argues that the items described in the first five causes were, in all events, "finally" paid and the Bank is liable for the face amount of the items regardless of whether its status is that of a collecting bank or a payor bank.

We conclude that the competent, material, undisputed evidence establishes that the Bank was a "payor bank" and was accountable when it did not return the items involved in the first four causes of action, and that it is therefore liable for the face amount of those items, less the amounts which Berman did recover by retrieving certain of the goods. We further find that the clearing agreement was properly received in evidence and that

the trial court abused its discretion in excluding the testimony of the witness Yahnke. As to the fifth cause, we find there is a factual dispute as to whether the item was returned within the time provided by law and remand for retrial on that issue only. As to the cross-appeal, we find that Berman's evidence was insufficient to require submission of the issues to the jury.

The Evidence

The substance of the evidence is as follows: The Bank and Chase Manhattan Bank (hereinafter called Chase) had been, for a number of years, financing the operations of Ferer, which dealt in metals on an international scale. Aaron Ferer, the chief officer of Ferer, was a director of the Bank. Ferer had been purchasing metals from Berman for a period of years and over a period of time had purchased from him metal of the value of about $4,000,000. For an undisclosed period of time prior to the transactions here involved, the sales by Berman to Ferer were handled as follows. Berman would notify Ferer of the fact that the shipment was ready for delivery and inform Ferer of the weight and price. Berman would then release the shipment to Ferer, either at Watsonville or Oakland, California. A few days later Ferer would send Berman a draft in payment. This delayed payment arrangement was agreed to by Berman after Ferer had informed him of a "cash flow" problem.

The draft involved in the first cause of action was in the following form:

AARON FERER & SONS CO.
909 ABBOTT DRIVE ■ PHONE 342-2436 A.C 402
OMAHA, NEBRASKA 68102

ESTABLISHED 1866

27-5
1040

CKN° 1827

PAY EXACTLY          DOLLARS AND          CENTS          AMOUNT

***61,660.80*

PAY TO THE
ORDER OF  2 3Berman Steel Co.

DATE 4/9/74

AUTHORIZED SIGNATURES

⑈0018 27⑈ ⑆1040⑈0005⑆  ⑈800⑈913⑈

VOID IF NOT CASHED WITHIN 90 DAYS

THROUGH:
THE UNITED STATES
NATIONAL BANK OF OMAHA

The subsequent drafts prepared by Ferer were in identical form except for date and amount. The signatures on the face of the draft were those of Ferer's officers. The second cause of action involved draft No. 1861, dated April 12, 1974, and was in the amount of $121,-793.02. The draft involved in the third cause was No. 1843, dated April 10, 1974, and was in the amount of $80,971.95. The draft involved in the fourth cause was No. 1850, also dated April 10, 1974, and was in the amount of $116,089.69. The fifth cause of action involved draft No. 1844, also dated April 10, 1974, and was in the amount of $111,713.56.

Upon receipt of these drafts Berman endorsed and deposited them in his account in the Crocker National Bank in Salinas, California. The depository bank in turn endorsed and transmitted the drafts to the Federal Reserve Bank (herein referred to as Fed) in Omaha. The Fed, upon receipt of the drafts, charged them to the Bank's reserve account at the Fed and then forwarded them, together with other items, accompanied by a transmittal called a "cash letter," to the Bank for payment. The first four drafts were received by the Bank on Thursday, April 18, 1974, and the draft which is the subject of the fifth cause of action was received on Friday, April 19, 1974.

The Bank's procedure for handling such items was as follows. On the day of receipt the items were routed to the proof transit department where they were batched and prepared for data processing. They then went to the computer room where the micro encoding (magnetic ink character recognition) on the bottom of the check was read and they were sorted by the identifying bank numbers. Those items which bore the Bank's number were sorted from transit items which were items drawn on other banks. After sorting, the transit items, the "on us" items, were sorted and provisional postings were made by computer to each individual checking account. After this posting the "on us"

items were sent to the bookkeeping department so that personnel might check endorsements, signatures, and balances in accounts on which the instruments were drawn. In the event there was an overdraft or other problem, an officer of the Bank was notified and a determination was made by that officer whether that item was to be paid or not. The bookkeeping department performed the above functions on the day following the receipt of the item. Instruments not paid were customarily returned to the Fed by 3:30 p.m. the day after receipt by the Bank.

The Bank described instruments such as are here involved as "payable through" drafts and as to those a prelist was made on the day of receipt by the Bank. From the computer those drafts then went to a "payable through clerk" who balanced the prelist. On the day following receipt the payable through clerk balanced her work and prepared a credit to an account in the name of Ferer called the "payable through account." (The function of this account will be later described.) Ferer's regular account had at that time already been debited. At that point at about 8:30 or 9 o'clock a.m., the drafts, along with the prelists, were delivered to the bank officer having charge of commercial loans. This procedure was followed in the case of the drafts here in question. On Friday, April 19, 1974, Ferer, as was customary, picked up from the officer's desk the four drafts which had been received the preceding day, in this instance the drafts which are the basis of the first four causes. The bank officer in charge testified that a written acceptance of the drafts by Ferer was never required, that no conversation between Ferer and the officer needed to ever take place, and that after Ferer picked up the draft nothing remained for the Bank to do so far as Ferer was concerned.

It now becomes pertinent to examine how the financing of Ferer by the Bank and Chase was arranged and carried out. We will then return to the sequence of

events which led to this litigation. Ferer had executed with the Bank under date of April 30, 1970, a $1,100,000 revolving credit demand note by which it agreed to pay the principal amount of the note, "or the aggregate unpaid principal amount of all advances which the bank may hereafter make to the Borrower under this NOTE, whichever amount is less." The note provided for interest to be paid monthly. The note was secured by a security agreement. An appropriate financing statement had been recorded. The security agreement covered "Contract Rights, Inventory, Instruments, Documents of title, Chattel Paper, Accounts," and was given to secure certain described notes and "additional advances." There also existed another "Credit and Security Agreement" bearing date of April 22, 1970, between Ferer, Bank, and Chase. This agreement pertained to the "revolving credit . . . not exceeding $1,-100,000" to Ferer from the Bank, and also to loans by Chase to Ferer for drafts which Chase might accept "not exceeding $5,000,000 at any one time outstanding." Among other things the agreement provided for the sharing by the Bank and Chase of loans, benefits of collateral, and payments received from Ferer. The agreement granted Chase, as agent for itself and Bank, a continuing security interest in collateral for "all indebtedness, obligations and liabilities of any kind." The agreement provided that neither Bank nor Chase would, without the consent of the other, make advances in excess of the amounts named. It provided that Chase and Bank would share in the credit and risks and the benefit of collateral and of payments in the proportions of 11/61 for the Bank and 50/61 for Chase. It provided that both Chase and the Bank open on their respective books a "collateral account in the name of Chase." It required Ferer "to deposit in the Collateral Accounts all amounts received by Ferer on account of the Accounts and all proceeds of sales of Inventory, [and that

it should] be held and applied by Chase in accordance with this agreement."

Chase and the Bank were authorized to terminate the credit arrangement at any time. This instrument was dated April 22, 1970.

Under date of February 15, 1973, the Bank and Ferer had executed an instrument called "Agreement as to Payable Through Items." It recited: "WHEREAS, Bank will receive in cash letters or collection letters various items drawn on Customer *for which Bank is required to make provisional settlement on the day of receipt and return or make final settlement on the day following receipt;*" (emphasis supplied), and that Ferer desired an opportunity to inspect and verify said items prior to paying or rejecting them. The agreement, among other things, provided that: "Customer shall make provisional settlement by accepting immediate charge to his account that same day or in lieu thereof by payment by check at the time of delivery. Said items or such as Customer refuses may be returned and the provisional settlement for such returned items revoked on the bank day following." By the terms of the contract *Ferer bound itself to hold the Bank harmless and reimburse it for any loss* "*in the event Bank incurs any liability on account of failure to return any items within the time permitted by law* or agreement *because of complying with the terms of this agreement.*" (Emphasis supplied.)

At the Bank three accounts pertaining to the business of Ferer were maintained. One was the Chase-Ferer collateral account established pursuant to the agreement of April 22, 1970, above-described. In this account Ferer deposited the checks and drafts from sales of inventory. Ferer was not authorized to make withdrawals from this account. The second account was Ferer's general or checking account. This was the account against which Ferer's checks and drafts were charged. Deposits to this account were made by trans-

fers from the collateral account upon authorization by Chase, which was obtained daily by the officer of the Bank whose responsibility was to supervise the Ferer loans and accounts. The third account was the "payable through" account and this was simply a bookkeeping account to enable the Bank to keep an accurate and separate record of the drafts of Ferer received by the Bank under the payable through agreement. The Bank also kept a separate overdraft report on this account although it did not represent any funds deposited. The "overdrafts" on this account were not included in the general overdraft reports.

From at least April 1, 1974, forward, the Ferer general account was in a continuous state of overdraft. The drafts which are the basis of the first four causes of action, along with numerous other items, were debited to this account on April 18, 1974. The overdraft at the end of the day was $1,789,113.90. The draft involved in the fifth cause of action, along with numerous other items, was debited to the account on April 19, 1974. At the end of that day the overdraft in the account was $2,707,381.37. Debits to these accounts are not made by individual item, but in one total for a "batch." The balance in the collateral account at the corresponding times was $126,788.75 and $410,286.11. On both April 18th and 19th, Chase authorized transfers from the collateral account to the regular account which were made. On Monday, April 22nd, a deposit of $608,480.15 was made by Ferer to the general account. On April 22nd, Ferer deposited $2,076,243.69 to the collateral account. This, with other deposits to the account, made a balance at the end of the day in that account of $2,863,849.06. The $2,000,000 plus deposit was made by Ferer pursuant to a call from the officer of the Bank having charge of the Ferer loan and whose duty it was, among other things, to determine how much overdraft to permit in the Ferer general account.

This officer, who was called by Berman as a witness, we will hereafter refer to as V.P.

On April 19th, at about noon, as already noted, Aaron Ferer had picked up from the V.P.'s desk the drafts which had been received on the preceding day, including those here involved. The drafts received on April 19th, including that involved in the fifth cause of action, were ready for Ferer to pick up at noon on April 22nd. However, at that time Aaron Ferer was in New York and the draft which is the basis of the fifth cause was never picked up, nor was payment by Ferer ever refused.

The usual way for overdrafts in the general account to be met or reduced in part was by a transfer from the collateral account pursuant to the agreement of April 22, 1970, after approval by Chase.

Ferer had at no time during the history of the arrangement ever directed that a draft not be paid. As of noon on April 22nd, Ferer had already made the $2,000,000 plus deposit above described and V.P. then considered Ferer's account healthy and anticipated that the usual daily authorization from Chase to make transfers from the collateral account would be given. At 3:29 p.m. on April 22nd permission was refused.

At about 2:30 p.m. on April 22nd, V.P. was called to a meeting with other Bank officers. He was there informed, "Aaron Ferer was in a short position on the London Metal Exchange which could lose them, oh, approximately twenty to twenty-five million dollars . . . . Aaron Ferer was hopelessly in trouble." A decision was made at that time to "return everything we could and the legal question would be resolved later." V.P., pursuant to instructions from his superiors, then went to the Ferer place of business and asked for and received the drafts which had been received by the Bank on April 18th and delivered to Aaron Ferer on April 19th. Those drafts, as well as those of April 19th which Ferer had not picked up on April 22nd, were then marked in-

sufficient funds and were then given to a bank messenger for return to the Fed. The Bank was attempting to get the items to the Fed by a 3:30 p.m. deadline prescribed in the clearing agreement, the admittance of which into evidence is the subject of one of the assigned errors. Objection to the testimony of this messenger was sustained for the reason mentioned in the assignment of errors we earlier set forth. This ruling and other pertinent evidence we will discuss later.

On April 23rd the Bank sent to Berman telegraphed notice that the drafts had been dishonored. Also on April 23rd it reversed the charges of the drafts made to Berman's account on April 18th and 19th. On that day the Bank also decided to return to the payees the items of April 16th and 17th. This was done after apparently retrieving them from Ferer. However, these items were subsequently paid by the Bank as were all the items of the 18th and 19th except those involved in this litigation.

On April 24th the overdraft and note were substantially paid by charging the collateral account. Overdrafts at Chase were removed in similar fashion. The acknowledged purpose of returning the various items was to "protect the bank's position as far as its loan account and its overdraft account was concerned."

Berman's depository bank refused the return of the items because notice and return were untimely. Berman then began this action.

### The Contention of the Parties

The Bank's basic position is that the items are "payable through" drafts and as a consequence it was a collecting bank liable only for the exercise of ordinary care in carrying out the obligations imposed upon it; and that if it was in fact negligent, the measure of damages is the face amount of the items reduced by any amount which could not have been realized by ordinary care. It contends that at best the issue of its negligence was a jury question and that since Berman pre-

sented no proof at all that anything could have been realized from Ferer, even if ordinary care had been exercised, it was entitled to a directed verdict because there is no proof of damages in accordance with the legal measure.

Berman's primary position is that the Bank was a "payor bank" under the provisions of the Uniform Commercial Code and, because it failed to return the items or give notice of dishonor or nonpayment before the deadline or the earlier deadline established by the clearing agreement, it was "accountable" under code provisions for the face amount of the items. He also takes the position that irrespective of the Bank's status as a collecting bank or a payor bank, final settlement had been made for the items and the Bank could not reverse the transaction after the deadline for return. We accept Berman's position.

Code Provisions
General

For reasons which will become apparent, we will treat the action of the trial court in the first four causes separately from its action in the fifth. We perceive several separate legal theories upon which the action of the trial court in the first four causes of action must be sustained. However, to found this opinion upon each of them would unduly extend what is already a very lengthy opinion. Nonetheless, some of the grounds are interrelated and some of the interconnections will be apparent as the statutory provisions are discussed.

Article 4 of the Uniform Commercial Code, dealing with bank deposits and collections and the pertinent portions of Articles 1 and 3, are, on their face, complex and their specific application to some factual situations is not readily apparent upon casual reading. In fact, the authorities state that the rules therein laid down are not intended to and do not cover every situation. It is up to the courts to fill in the interstices.

An understanding of our determination makes it nec-

essary to refer to various provisions of the Uniform Commercial Code. In making such references we will, in many instances, simply paraphrase the code provision, using only that part of the section or sentence which we deem pertinent under the factual situation before us, omitting parts which might have bearing in other factual contexts.

It is clear that the instruments here involved are demand instruments. These by definition include instruments payable at sight or at presentation. § 3-108, U. C.C. Such negotiable instruments, if drawn on a bank, are that form of draft known as a check. § 3-104(1) (2), U.C.C.

Section 3-120, U.C.C., provides that an instrument that says that it is "payable through" a bank has the effect of designating that bank as a "collecting bank" to make presentment, but does not of itself authorize the bank to pay the instrument. The comment to that section says: "The bank is not named as drawee, and it is not ordered or even authorized to pay the instrument out of the drawer's account or any other funds of the drawer in its hands. Neither is it required to take the instrument for collection in the absence of special agreement to that effect."

Section 4-105, U.C.C., gives names to the varying functions which banks in the collection chain perform. Among other things it provides that: ". . . unless the context otherwise requires," that "(b) 'Payor bank' means a bank *by which* an item is payable *as drawn or accepted,*" and "(d) 'Collecting bank' means any bank handling the item for collection except the payor bank." (Emphasis supplied.)

Both collecting and payor banks are required to perform certain of the duties by a "midnight deadline." The " 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item." § 4-104 (1)(h), U.C.C. " 'Customer' means any person having

an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank." § 4-104(1)(e), U.C.C.

## The Collecting Bank

Section 4-202, U.C.C., imposes upon a collecting bank the duty to exercise ordinary care in presenting an item, in sending notice of dishonor or nonpayment, in returning an item, and in settling when the bank receives final settlement. In respect of return of an item, if a bank acts before its midnight deadline following receipt of an item, it acts seasonably. A reasonably longer time may be seasonable, but the bank has the burden of so establishing.

Presentment is a demand for acceptance or payment. § 3-504, U.C.C. Acceptance may be deferred until the close of the next business day following presentment, "but *payment must* be made in any event *before the close of business on the day of presentment.*" § 3-506 (2), U.C.C. (Emphasis supplied.) Where acceptance is required, the acceptance must be in writing by signature of the acceptor. § 3-410(1), U.C.C. Section 4-103 (5), U.C.C., makes the measure of damages the rule which is asserted by the bank, namely, "the amount of the item reduced by an amount which could not have been realized by the use of ordinary care." It also provides for consequential damages proximately caused if there has been bad faith.

A collecting bank which has made a provisional settlement (i.e., a settlement which is subject to revocation), but which itself fails to receive payment, may charge back the item if, by its midnight deadline or within a reasonably longer time after it learns of the facts, it returns the item or gives notice of the pertinent facts. The right to charge back terminates if and when a settlement received becomes final, § 4-212, U.C.C., because of final payment by the payor bank. § 4-213(3), U.C.C. The right to charge back must be exercised promptly. Comment 3, § 4-212, U.C.C.

The code places no duty upon a collecting bank to provisionally settle for an item when it is received for collection. Uniform Commercial Code Practice Handbook (4th Ed.), Bank Deposits & Collections, Clark, Bailey & Young, p. 71.

If a collecting bank receives a settlement that is or becomes final, the bank is accountable to its customer for the amount of any item and any provisional credit given becomes final. § 4-213, U.C.C. By court interpretation accountable means that it is liable for the amount of the item. Rock Island Auction Sales, Inc. v. Empire Packing Co., Inc., 32 Ill. 2d 269, 204 N. E. 2d 721.

## The Payor Bank

A payor bank may charge its customer's account for any item which is properly payable even though the charge may create an overdraft. § 4-401(1), U.C.C. A payor bank is liable to its customer for damages proximately caused by a wrongful dishonor. § 4-402, U.C.C.

With respect to items payable on demand, the payor bank's duty to settle or to return the item is governed by section 4-302, U.C.C. It requires the payor bank to settle for the item provisionally by midnight of the day of receipt, or become accountable for the amount unless it returns the item on that day. However, if it has made timely provisional settlement, it may revoke the provisional settlement up until its midnight deadline, that is, midnight on the day following. § 4-301, U.C.C. This section assumes that final payment has not been made under section 4-213(1), U.C.C. If it has, then section 4-301, U.C.C., has no application. See Comment 5, § 4-301, U.C.C.

A payor bank has finally paid an item whenever it has settled for the item without reserving a right to revoke and without having that right under statute, clearing house rule, or agreement, or has completed the process of posting to the indicated account of the drawer, maker, or other person to be charged therewith, or where it has made a provisional settlement and

failed to revoke the settlement in the time and manner permitted by statute, clearing house rule, or agreement. § 4-213(1), U.C.C. *Upon such final payment it is accountable.* Rock Island Auction Sales, Inc. v. Empire Packing Co., Inc., *supra.*

A payor bank's right to exercise a setoff comes too late if it is exercised after the bank has "accepted" or completed the process of posting to the indicated account of the drawer, maker, "or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item," *or after it has become accountable for the late return of the item* by reason of the provisions of sections 4-213(1)(d) and 4-302, U.C.C. § 4-303(1), U.C.C.

### Rationale

We now proceed to an application of the above principles to the facts before us. We do not believe that it is undisputably clear that the items are on their face "payable through" drafts. We call attention to the following: They bear the designation "CK" (checks); the form of the instrument does not make clear whether the drawee is the Bank, or Ferer, the maker. Drafts, as distinguished from mere checks, frequently bear the designation "To" before the name of the drawee. There is nothing on the face of the instruments which indicates that acceptance by Ferer or even presentment to Ferer is required; the notation at the bottom, "void if not cashed within 90 days," is more characteristic of a check than a draft since a draft ordinarily, at least, is for immediate presentment; the instruments do not bear the words "payable through," but simply the word "through" in small print followed by the name of the bank. Some courts have determined whether a draft was "payable through" by looking merely at the face of the instrument. See, e.g., Aetna Cas. & Sur. Co. v. Traders Nat. Bank & Trust Co., 514 S. W. 2d 860 (Mo. App.), 15 U.C.C. Rptng. Serv. 1112. Doubtless this is the way in which the determination must ordinarily be

made. However, where ambiguity exists we think another course is, depending upon the facts of the case, permissible. Wilhelm Foods, Inc. v. National Bank of North America, 382 F. Supp. 605, 15 U.C.C. Rptng. Serv. 456. In that case the instrument was ambiguous and the court admitted parol evidence and determined as a matter of fact that the Bank was a collecting and not a payor bank.

We think, therefore, that it is necessary to determine the function that the Bank was in fact performing in order to determine its status as either a "collecting bank" or a "payor bank." When we do this and compare the functions performed with those duties of collecting and payor banks described in the statute, we conclude that under the uncontradicted evidence the Bank was performing the functions of a "payor bank."

We first look at the "Agreement as to Payable Through Items" as well as to what the Bank and Ferer, in fact, did over a long period of time. The agreement itself seems to be a hybrid and would enable the Bank to take either position.

This agreement contemplated "provisional settlement" on the day of receipt and "final settlement" on the day following receipt. These acts refer to the Bank's function as the last agent in the chain of collection from the payee Berman to the maker Ferer. The record establishes that without deviation provisional settlement was made on the day of receipt and final settlement on the day following receipt. As to the maker Ferer, however, the agreement provided a different time schedule. The Bank could, on the day after the receipt, "present" to Ferer by messenger, or Ferer itself would "pickup at Bank." This latter procedure was the process in fact followed. "Pickup" by customer was regarded by the Bank as approval by Ferer to make an "immediate charge." The agreement mentioned payment by check but that was apparently never done. In fact, Ferer seemed to have no source of paying the Bank

by check because its income from sales went into the "collateral accounts" at the Bank or at Chase and which were controlled by Chase as agent for the Bank, with an apparent veto power in its own and the Bank's interest. The agreement recognizes the Bank's liability to its forwarder, the Fed, for late return and accepts Ferer's agreement to reimburse the Bank if it should be liable because of failure to return an item on time.

The Bank uniformly charged the items to Ferer's account even though it created an overdraft. These overdrafts were met or reduced by transfers from the collateral account at the bank after deadline for return of the items had passed.

If the Bank were merely a collecting bank its duties were to make a presentment, which means a demand for acceptance or payment. § 3-504, U.C.C. This it never did. It always paid the drafts by charging Ferer's account and accepting its obligation to pay or reimburse. The decision to pay was made by a bank officer, not by Ferer. This form of procedure follows that performed by a payor bank and not by a collecting bank.

A collecting bank is not required to give immediate credit for the item which it receives for collection. Uniform Commercial Code Practice Handbook (4th Ed.), Bank Deposits & Collections, Clark, Bailey & Young, p. 12. A collecting bank should demand an acceptance and obtain it in writing. §§ 4-202, 3-504, and 3-410(1), U.C.C. In this case the instrument needed no acceptance. It already bore the signature of Ferer and Ferer was already bound thereon to the payee, assuming no failure of consideration. When we consider the agreement and the practice together, the process was different from that used in paying checks only in that Ferer, by being able to pick up the drafts on the day after receipt, was given an opportunity to stop payment. If it did not affirmatively refuse the item, it was considered to be payable. This is analogous to the pro-

cedure for stopping payment on a check. § 4-403, U.C.C. Any decision thereafter, before the midnight deadline, was made by the Bank.

The Bank, of course, had the right not to pay the item if there were insufficient funds provided it chose to return before the midnight deadline. § 4-301, U.C.C. The effect of a decision not to return was to make the provisional settlement final. § 4-302, U.C.C. In connection with the items received on April 18th, we need not at this time consider whether the earlier deadline provided by the "clearing agreement" is applicable because no return was made as to those items before either deadline.

If we look at the situation from a little different perspective, the conclusion is fortified. Assume the same written agreement between the Bank and Ferer and the same course of conduct between them and the same course by the Bank in honoring Ferer's overdrafts. But assume further that at the time the items in question were received instead of having an overdraft there were, in the general account, sufficient funds to pay the items, or alternatively that there were no funds in the general account but adequate funds in the collateral account to pay and an unobligated note to secure any overdraft. Suppose then that Ferer had not come in on the 19th either to pick up the drafts or to exercise its right of refusal or to stop payment, and the Bank, before the midnight deadline (or the 3:30 p.m. deadline if it were applicable), returned the items to the Fed as it would be entitled to do if it were only a collecting bank. Would not in this case the Bank be liable to Ferer for wrongful dishonor by a payor bank under section 4-402, U.C.C.? If that were the question before us the answer would seem to be clear enough. It seems clear to us that the Bank's function was not a shifting one, that is, a collecting bank if Ferer was without funds and a payor bank if it had funds.

In connection with our determination, one item of

evidence should be mentioned. A Bank officer, not the one responsible for supervising the Ferer loan or determining how much overdraft should be permitted, testified by way of conclusion that the reason for having Ferer physically pick up the drafts and take them was for the purpose of giving it an opportunity of "honoring" or "dishonoring." It is apparent that the questions and answers put to this witness were hypothetical and not made with personal knowledge of the facts as they applied to Ferer. This testimony does not furnish the "more than a scintilla" of evidence necessary to create a fact question as to the Bank's status.

We hold that the Bank, as a payor bank, had until the midnight deadline, that is, midnight of April 19th, to return to the Fed the items received on the 18th, or if they could not be returned, to give notice of the facts. It did neither. It was accountable to its customer Berman.

At this point it is pertinent to note three of the specific contentions of the Bank. It contends, citing New York Commercial Code Practice Commentary, that its deadline was extended because the time for return began to run from the dishonor of the items by Ferer. Even assuming that the Bank was a collecting bank, the undisputed fact is that Ferer did not dishonor the draft. Indeed it had no reason to dishonor. It had received the goods at the point of shipment. The Bank likewise contends that it had an additional day by virtue of the provisions of section 4-108(1), U.C.C., to make a good faith effort to collect. Again there is no evidence that it was making a good faith effort to collect from Ferer. After 2:30 p.m. on April 22nd all its efforts were directed to putting itself in a position to exercise a setoff. This it could not do after the midnight deadline of April 19th. § 4-303(1)(e), U.C.C. Before that time it is clear that it intended to accept Ferer's credit. It likewise contends that as a collecting bank it had a right to charge back until settlement became final,

§ 4-212(1), U.C.C., and in connection therewith that section 4-211(3)(c), U.C.C., is the applicable statute. This subsection and others pertain to settlement by remittance instrument. The record clearly demonstrates that settlement was being made by debits and credits between the Bank and the Fed and on down the line to the depository bank. Comments to section 4-211, U.C.C., says that that section "does not purport to deal with 'cash items' . . . settlements merely by debits and credits in accounts between banks . . . or settlements between clearing houses."

Admission of the Clearing Agreement

Pursuant to congressional authorization and under the provisions of Regulation J issued by the Board of Governors of the Federal Reserve System pursuant to the statutes, Federal Reserve Banks are authorized to act as collecting banks.

Berman offered, and there was received in evidence over the Bank's objection, a certain "clearing agreement" between the Fed, the Bank, and other Omaha national banks. It provided that the banks establish reserve accounts at the Fed; that all items drawn on a bank would be charged against the reserve account of the bank on which drawn, providing various rules to be followed, among which was the following: "The drawee bank shall have the right to return all items handled by said Federal Reserve Bank hereunder, . . . to said Omaha Branch not later than 3:30 P.M. on the next business day following the date of receipt of the same"; that settlement on such items returned within the deadline was only provisional; and that upon expiration of the deadline without return the settlement was final. Such agreement altering the provisions of the Uniform Commercial Code are authorized by statute. § 4-103(1), U.C.C.

Objection was made to the admittance of the agreement on the grounds that it was irrelevant and immaterial because it did not pertain to "payable through"

drafts. This contention is, of course, not good if, as we have determined, the drafts were not payable through drafts.

## Was the Item Received on the 19th Returned Before the Deadline?

By virtue of paragraph 9 of the clearing agreement previously mentioned, the Bank and the other national banks in Omaha agreed with the Fed on a time for returning items earlier than the midnight deadline, to wit, 3:30 p.m. It also provided that failure to return by the 3:30 p.m. deadline constituted final payment. Clearing agreements modifying deadlines, such as is here involved, seem to be the kind of agreement contemplated by section 4-103(2), U.C.C., which reads: "Federal reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled." See comment 3 to section 4-103, U.C.C. at pages 318, 319. Also, see, Uniform Commercial Code Practice Handbook (4th Ed), Bank Deposits & Collections, Clarke, Bailey & Young, pp. 21, 162, 194, 195; The Law of Bank Deposits, Collections and Credit Cards, Clark & Squillante, pp. 14 to 16.

There exists in the record a factual dispute as to whether the item received on the 19th was returned before this deadline. An employee of the Fed in charge of returned items testified that the items had not been returned when she left the Fed at 4:30 p.m. on the 22nd, a Monday, which was the next banking day following the 19th. She also testified that notice of return of the drafts was not given to the depository bank until April 23rd. An officer of the Bank testified that he handed the items to the messenger Yahnke at about 3:25 or 3:26 p.m. with instructions to return them to the Fed. Yahnke's testimony was excluded for failure of Bank to disclose in answer to interrogatories Yahnke's name as a prospective witness. The offer of proof was that

Yahnke received the drafts at a little before 3:25 p.m., that he proceeded at once to the Fed, and that when he arrived at the return desk of the Fed it was about 3:28 p.m.

We conclude that the trial court abused its discretion in excluding the offer of the testimony of Yahnke. An examination of the bill of exceptions leads us to the belief that long before trial Berman's attorney during pre-trial discovery proceedings became aware of the existence of the messenger, but not of his name. Both sides thereafter failed to follow through on an understanding that the name would be obtained. Further, because of the ambiguous nature of the question and answer in the interrogatories which refer to persons who "in any way worked with or handled the A. F. Ferer & Sons account or have any knowledge of the items," we do not feel that a conclusion that the Bank intentionally withheld the name of the witness can be sustained.

The messenger was not one "handling" or "having knowledge" of the "account." As to his knowledge of "items," there is no evidence to show the messenger had any knowledge of the specifics of what he delivered. He would apparently only know that he made a delivery of the items entrusted to him. For the above reasons we reverse the court's finding on the fifth cause and remand it for retrial solely on the issue of whether the item received on the 19th, and which is the basis of the fifth cause of action, was returned to the Fed before the 3:30 p.m. deadline on April 22nd.

We conclude from an examination of the record that the evidence was insufficient to sustain Berman's sixth and seventh causes of action and affirm the action of the trial court in directing the verdict against Berman on these causes.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion

herein because I do not agree with its basic premise that the United States National Bank was a payor bank. I agree that the United States National Bank was a collecting bank in these transactions. The distinction is important as under the Uniform Commercial Code there are different provisions applicable to determine the proper deadline for return of items and for notification of dishonor. The same is true as to the measure of damages for the two types of transactions. The Uniform Commercial Code subjects collecting banks to less stringent return deadlines and damage provisions than it does payor banks.

Notwithstanding the fact the symbol "CK No." is printed on the instruments, they are drafts drawn by Ferer on itself, payable to the order of Berman Steel Company, with the legend printed on the face of the draft "through the United States National Bank of Omaha."

Section 3-120, U.C.C., provides as follows: "An instrument which states that it is 'payable through' a bank or the like designates that bank as a collecting bank to make presentment but does not of itself authorize the bank to pay the instrument." The comment to § 3-120, U.C.C., reads in part as follows: "This section states the commercial understanding as to the effect of such language. The bank is not named as a drawee, and it is not ordered or even authorized to pay the instrument out of the drawer's account or any other funds of the drawer in its hands. Neither is it required to take the instrument for collection in the absence of special agreement to that effect. It is merely designated as a collecting bank through which presentment is properly made to the drawee."

In addition, section 4-105, U.C.C., defines the term "payor bank" as "a bank by which an item is payable as drawn or accepted." Comment 3 to that section states: "Items are sometimes drawn or accepted 'payable through' a particular bank. Under this section and

section 3-120 the 'payable through' bank (if it in fact handles the item) will be a collecting (and often a presenting) bank; it is not a 'payor bank.' "

I agree with the majority opinion as to the reversal on the fifth cause of action, and the affirmance of the action on the cross-appeal. I believe the judgment should also be reversed as to the first four causes of action.

BOSLAUGH, J., joins in this dissent.