

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-26-1995

# Univ Premium v York Bank

Precedential or Non-Precedential:

Docket 94-2047

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Univ Premium v York Bank" (1995). *1995 Decisions.* Paper 282.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/282

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 94-2047/2048
_____


UNIVERSAL PREMIUM ACCEPTANCE CORPORATION,
                              Appellant
                    v.
        THE YORK BANK & TRUST COMPANY,
                              Appellee
_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Nos. 94-cv-02138, 94-cv-05735)
_____


Argued June 29, 1995

Before:  HUTCHINSON*, ROTH, and WEIS, Circuit Judges

Filed October 26, l995
_____


Jane C. Silver, Esquire (ARGUED)
Richard P. McElroy, Esquire
BLANK, ROME, COMISKY & McCAULEY
1200 Four Penn Center Plaza
Philadelphia, PA  19103

Attorneys for Appellant

Ronald P. Schiller, Esquire (ARGUED)
Piper & Marbury
Two Logan Square, Suite 3400
18th & Arch Streets
Philadelphia, PA  19103


_____


* The Honorable William D. Hutchinson participated in the oral
argument and decision in this case, but died before he could join
or concur in this Opinion.

C. Lamar Garren, Esquire
Piper & Marbury
Charles Center South
36 South Charles Street
Baltimore, Maryland  21201

Attorneys for Appellee

_____

OPINION OF THE COURT

_____


WEIS, Circuit Judge.

Defendant bank accepted drafts drawn on plaintiff containing the direction "PAY AND DEPOSIT ONLY TO THE CREDIT OF [payee]" and on which the payee's indorsements were forged. Reasoning that the drafts were in effect negotiable, the district court in this diversity case entered judgment for the bank, based on Article 3 of the Uniform Commercial Code as adopted in Pennsylvania.  We conclude that the explicit direction on the drafts precluded transfer and made them non-negotiable. Moreover, we hold that the indorsements in blank did not make the drafts bearer paper.  Accordingly, we will reverse the judgment in favor of the bank and remand the matter for resolution of the plaintiff's claims under the bank collection provisions of the Uniform Commercial Code and the common law.

Universal Premium Acceptance Corporation, having its principal office in St. Louis, Missouri, provides financing to policyholders to pay their insurance premiums.  In the fall of 1991, Walter Talbot of the W. Talbot Insurance Agency in

2

Lancaster, Pennsylvania, requested Universal to provide financing for his customers who needed funds to pay premiums on policies issued by the Great American Insurance Company.

Universal accepted Talbot's proposal and sent him the necessary documents, including blank drafts. The face of each instrument contained Universal's name and address in the top left corner, and a large UPAC logo in the top center. Below UPAC's address was printed "PAY AND DEPOSIT ONLY TO THE CREDIT OF: _____ INSURANCE CO." with a space for the amount. On the lower right side of the instrument were blanks for the policyholder's name, the insurance agency name, and a line for "SIGNATURE OF PRODUCER OF RECORD/BROKER/AGENT." In the lower right corner beneath the signature line appear the name and address of the Landmark Bank.

The back of each instrument contained pre-printed language: "Acceptance of this draft acknowledges Universal Premium Acceptance Corporation's interest in the unearned or return premium(s) and that we have issued a policy(ies) to the named applicant (insured) in the amount of the premium indicated."

Between September 1991 and July 1992, Talbot signed drafts for more than $1 million in favor of Great American, but did not deliver them to the insurance company. Instead, he arranged for his confederates to forge the indorsement of Great American and deposit the drafts in an account they opened at defendant York Bank under the name of "Small Businessman's Service Corporation." York deposited the drafts without securing the indorsement of Small Businessman's Service Corporation and transmitted them to Landmark (later renamed Magna Bank of Missouri), Universal's bank in St. Louis.

As part of the scheme, Talbot and his associates set up a dummy "Great American Insurance Company" office in Lancaster and furnished its address and telephone number to Universal. To verify that Great American had issued a policy, Universal would contact that office. After assurance from Talbot's cohorts there that the transaction was in order, Universal would then authorize Landmark to pay the draft.

After the fraud was discovered, Talbot was convicted and imprisoned. Universal recovered part of its loss from Talbot and then filed suit in its own behalf and as assignee of Landmark against York. The complaints asserted claims under Articles 3 and 4 of the Uniform Commercial Code as enacted in Pennsylvania at 13 Pa. Cons. Stat. Ann. §§ 3101-4504, as well as for negligence and conversion.

4

The district court granted summary judgment for York. Essentially adopting the theories the bank had advanced, the court decided that:

1. The drafts were to be treated as if they were negotiable. Although they did not contain the terms "to the order of" or "to bearer," they could be viewed as negotiable under 13 Pa. Cons. Stat. Ann. § 3805.

2. Talbot signed the drafts on behalf of Universal.

3. Because Talbot did not intend Great American to have any interest in the drafts, 13 Pa. Cons. Stat. Ann. § 3405(a), the fictitious payee provision, applied and shielded York from what otherwise would have been its liability for paying on a forged indorsement.

4. The forged indorsement of Great American was in blank and thereby made the drafts payable to bearer.

5. Because the drafts had become bearer paper, York did not act in bad faith in depositing them in the Small Businessman's Service Corporation account.

Accordingly, the district court found that York was not liable under either the Uniform Commercial Code or common law.

Universal has appealed, contending that the limiting language as to the payee on the drafts did not permit York to deposit them in the Small Businessman's account, that the fictitious payee provision does not apply, and that the negligence claim should not have been resolved in York's favor.

I.

One of the requirements for negotiability under 13 Pa. Cons. Stat. Ann. § 3104(a)(3) is that an instrument must be

5

"payable to order or to bearer."[1]  How the parties regard or characterize the instrument is immaterial.  "The negotiability of an instrument cannot be established by waiver. . . . [W]here the statute requires certain elements, it is not for private persons to dispense with or waive them."  5A Ronald A. Anderson, Uniform Commercial Code § 3-104:13 (3d ed. 1994).  See also Anderson § 3-112:1 (official code comment).  The drafts here did not meet the terms of § 3104.

In some circumstances instruments that are not payable "to order" or "to bearer" may nevertheless be within the scope of Article 3 of the Code except that there can be no holder in due course of such an item.  13 Pa. Cons. Stat. Ann. § 3805 provides that Article 3 "applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within this division but which is not payable to order or to bearer
. . . ."

The commentary to section 3805 cites as a typical example an item that reads "Pay John Doe" without the words "to the order of."  See, e.g., Key Bank of Southeastern New York, N.A. v. Strober Bros., Inc., 523 N.Y.S.2d 855 (N.Y. App. Div. 1988).  Such instruments have been termed "technically non-negotiable" because they meet all requirements as to form except

_____

[1]Because the incidents in this case took place before the effective date of the revised edition of the Uniform Commercial Code presently in effect in Pennsylvania, the older version, rather than the current one, is applicable here.  See Menichini v. Grant, 995 F.2d 1224, 1229 n.5 (3d Cir. 1993).

they are not payable to order or bearer.[2]  See Henry J. Bailey & Richard B. Hagedorn, Brady on Bank Checks ¶ 2.17 (7th ed. 1992).

The language on the drafts, "PAY AND DEPOSIT ONLY TO THE CREDIT OF:  Great American Insurance Company," goes beyond a mere technicality.  Not only did these drafts lack "to the order of," they contained specific instructions -- "deposit only to the credit of."  Implicit in such language is a warning of non-negotiability.  See C.R. v. The Travelers, 626 A.2d 588 (Pa. Super. Ct. 1993) (presuming that proper restriction on face of draft would have prevented negotiation).

The drafts demonstrate that they were not meant to be freely transferable, but were to be "deposited" and "only" to the credit of the insurance company.  "Deposited" implies that the instruments were to have a limited use and a short transactional life.  "Only" can be understood to modify "deposited" or the payee, but in either instance, the language is quite restrictive. The terms on the face of the items were meant to preclude transfer.  See Resorts Int'l Hotel, Inc. v. Salomone, 429 A.2d 1078 (N.J. Super. Ct. App. Div. 1981) (counter checks); Central Bank v. Kaipern Santa Clara Fed. Credit Union, 191 Cal. App. 3d 186 (Cal. Ct. App. 1987) (money orders).  We hold, therefore,

---

[2]Section 3805 was deleted from the 1990 revision of the Code and a check payable "To John Doe" without the word "order" is now treated as a negotiable instrument and the holder in due course provisions do apply.  See 13 Pa. Cons. Stat. Ann. § 3104 & cmt. 2 (Supp. 1995) (effective July 9, 1993).  The revision to the Code intends that these instruments, which look like and are intended to be checks, should be treated as such.  We note that the drafts here are not checks and that the broad language of section 3805 has been deleted in the 1990 revision.

7

that the drafts were not "otherwise negotiable" within the scope of section 3805.

## II.

As an alternative method of finding negotiability, York argues that even if not originally negotiable, the indorsements in blank by "Great American" converted the drafts into "bearer," negotiable, instruments. We reject that premise.

13 Pa. Cons. Stat. Ann. § 3204(b) provides that a blank indorsement on a negotiable instrument transforms it into a bearer instrument, but that section has no application to a non-negotiable item. An item which is non-negotiable in its inception remains so. Mere indorsement of such a draft does not change its character. As one court remarked, to sanction any other result would enable an indorser to change the rights and liabilities of the prior parties in a most material fashion. Wettlaufer v. Baxter, 125 S.W. 741 (Ky. 1910). See also Foley v. Hardy, 253 Pac. 238 (Kan. 1927).

These cases are pre-U.C.C., but have retained their authoritative status. See Partney v. Reed, 889 S.W.2d 896 (Mo. Ct. App. 1994) (negotiability determined from four corners of instrument at time it was issued without reference to extrinsic facts).

> One commentator has remarked:
> "In order to understand the UCC definitions
> in the area of negotiable instruments, you
> must first know the law of negotiable

8

instruments.  In other words, the Code is not a code that tells a student or a banker or a lawyer what the law is.  It is rather a compilation of notes that may serve to remind you of law you had better know before you read the UCC."

David Mellinkoff, The Language of the Uniform Commercial Code, 77 Yale L. J. 185, 192-93 (1967).  For views on negotiability as expressed in later treatises, see Anderson § 3-202:56 at 503 ("An indorsement has no effect upon negotiability, without regard to the nature or terminology of the indorsement"); Brady on Bank Checks § 2.1 ("Negotiability must be determined solely by what is written on the face of the instrument").

We conclude, therefore, that the drafts did not become bearer or negotiable instruments by virtue of the forged blank indorsements of the Great American Insurance Company.

III.

The general rule is a bank that pays on a forged indorsement is liable to the drawer.  However, 13 Pa. Cons. Stat. Ann. § 3405(a) (the fictitious payee exception) provides that an indorsement by any person in the name of the designated payee is effective if the drawer intends the payee to have no interest in the instrument.  That provision is intended to protect banks that cash instruments with such forged indorsements and is based on the assumption that as between the bank and the drawer, the latter is in a better position to prevent the loss.

9

We have held that section 3405 should be interpreted broadly enough to carry out its purpose. New Amsterdam Casualty Co. v. First Pennsylvania Banking & Trust Co., 451 F.2d 892 (3d Cir. 1971). But, in McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 762 (3d Cir. 1990), we recognized that because this provision "is a banker's exception which dramatically departs from the general UCC rule and narrows the liability of a bank, courts should be cautious in expanding the section's scope beyond its explicit rationale." Commentators have also characterized section 3405 as a banker's provision that should be strictly construed so as not to give more protection than is stated. See James J. White & Robert S. Summers, Uniform Commercial Code § 16-8 (2d ed. 1980).

13 Pa. Cons. Stat. Ann. § 3405 is not applicable here because it speaks only to negotiable instruments. Although Article 3 of the Uniform Commercial Code is sometimes applied by analogy to non-negotiable instruments, in that situation as well, the same cautious approach to section 3405 should be used.

The scenario here is quite different from a scheme in which a faithless employee obtains a company check payable to a non-existent person and then cashes it. In such situations there is some merit in relieving the bank from liability and leaving the employer to bear the loss. However, the direction on the drafts here to "pay and deposit only to the credit of Great American" was explicit.

The action of York Bank in permitting the deposit of the drafts in the Small Businessman's Service Corporation account

10

instead of Great American's account created quite a different situation than cashing the check of a fictitious payee. The face of the drafts raised a red flag and was enough to put York on notice that something was amiss in the Talbot group's dealings with it. We are not persuaded that the fictitious payee exception should be carried over to the non-negotiable instruments in this case.

## IV.

Our conclusions that the drafts are non-negotiable and that the fictitious payee exemption is not applicable undermine the basic premises upon which the district court based its decision. Consequently, the case must be remanded to the district court for further proceedings during which the parties may develop their contentions consistent with appropriate legal principles. We expect that on remand some of the confusion that developed because of the alternative and, at some points, inconsistent theories advanced by the parties may be dispelled. The district court is entitled to a more focused presentation of the issues than that which occurred.

Our holding that these drafts were not negotiable means that some of the parties' arguments to this Court and the district court have become irrelevant. We need not discuss them further, but in the interests of simplification, we will dispose of several issues summarily so that they need not be considered on remand:

(1)  The mere fact that Universal entrusted Talbot with the forms is not a proper basis for imputation of agency between

11

him and Universal.  The premium financing agreement specifically disclaims such a relationship and there is no evidence of apparent authority in this record.

(2)  Universal is incorrect in characterizing the direction "pay and deposit only" on the face of the drafts as an "indorsement."

(3)  The parties' discussion about ratification of the forged indorsements is not pertinent at this point.  Pennsylvania does not permit ratification of a forgery on a non-negotiable item.  See Funds for Business Growth, Inc. v. Woodland Marble & Tile Co., 278 A.2d 922, 925 (Pa. 1971).

                                  V.

The test for negotiability of drafts and checks is the same, and therefore, to this point there has been no need to discuss the differences between the two types of instruments. On remand, however, the distinctions may be important in resolving the issues remaining.  A brief discussion on the nature of drafts therefore may be helpful.

The parties have correctly designated the items in question as drafts, but at times have treated them as checks.  A check may be described in general terms as an order to a bank by a person having an account there to pay on demand a specified amount of money to a designated payee.  Although all checks are drafts, not all drafts are checks.  Drafts may take other forms as well.  For example, if the order to pay is directed to a third party other than a bank or to a bank where the drawer does not have an account, the item is a draft, but not a check.

Drafts are sometimes used in sales transactions when the seller initiates the payment process rather than having the buyer issue a check. In what is to some extent a reversal of roles, the seller, as drawer, writes a draft on the buyer as drawee. Often the draft will provide that it is "payable through" a specified bank in which the buyer has an account.

That bank then pays the seller.

Drafts can also be used to implement a three-party transaction involving a buyer, seller and financing entity. As an illustration, a buyer of an automobile signs a draft drawn on a finance company but payable to an automobile dealer through a specified bank. The dealer deposits the draft in its own bank, which sends it to the finance company's bank. After it approves the transaction, the finance company directs its bank to pay the draft to the automobile dealer. Thereafter, the buyer makes periodic payments to the finance company.

In other instances, the arrangements between the buyer-drawee and his bank may provide that the bank is to receive bills of lading or other documentation as a pre-condition to honoring the drafts. These are called "documentary drafts."

Casualty insurance companies frequently use drafts for the payment of claims. Adjusters sign the drafts payable through a named bank and deliver them to the claimant. Copies of the draft and executed releases are sent to the home office, which can review those documents before authorizing its bank to pay the draft. This procedure gives the home office some control over the payment of claims. It also enables an insurance company to

13

place funds with the bank only when needed to honor drafts, rather than having the money remain idle in a checking account.

Another use of drafts is the withdrawal of funds from savings banks. That practice is described in <u>Pennsylvania Banker's Assoc. v. Secretary of Banking</u>, 392 A.2d 1319 (Pa. 1978). For a general discussion of various types of drafts, <u>see</u> Barkley Clark & Barbara Clark, <u>The Law of Bank Deposits, Collections and Credit Cards</u> ¶¶ 1.05, 13.01 (Rev. ed. 1995); <u>Brady on Bank Checks</u> ¶ 1.13 (7th ed. 1992); Daniel E. Murray, <u>Drafts "Payable Through" Banks</u>, 77 Com. L.J. 389 (1972). Steven B. Dow, <u>Determining Bank Status in Article Four Check Collections</u>, 49 U. Pitt. L. Rev. 43 (1987).

Universal uses drafts as a means of providing financing for policyholders to pay premiums due their insurance carriers. The arrangements are made through the insurance agents who sell the policies. The customary procedure is for the insurance agent, acting on behalf of the policyholder, to sign the draft form supplied by Universal, fill in the amount desired and insert the name of the insurance company issuing the policy. A copy of the draft, together with a Premium Finance Agreement executed by the policy holder, is sent to Universal.

The original draft is delivered directly to the insurance company, which deposits it in its bank. The original draft is then transmitted to Universal's bank, Landmark. On receipt, Landmark advises Universal, which is then required to instruct the bank within twenty-four or forty-eight hours whether to pay the draft. In that interim, Universal calls the insurance

14

company to verify that a policy had been issued and that the financing transaction is apparently in good order.

With this understanding of the business practices followed in this case, we note briefly the various claims asserted by Universal. Preliminarily, we point out that Talbot, as agent for the policyholder, was the drawer of the drafts. Universal was the drawee, not the "maker" as it was labeled by York employees. Great American was the payee. Landmark's status will be discussed infra.

VI.

In addition to, or in the alternative to Article 3, Universal based its claims on Article 4 of the Commercial Code, governing bank deposits and collections. Article 4's scope is not limited to negotiable instruments, but includes "items" that are defined as "any instrument for the payment of money even though it is not negotiable but does not include money." 13 Pa. Cons. Stat. Ann. § 4104. The drafts here come within that definition.

Universal relies on 13 Pa. Cons. Stat. Ann. § 4207(a), which provides for warranties that are applicable upon payment or acceptance of an item. That section provides in pertinent part that "[e]ach . . . collecting bank who obtains payment or acceptance of an item and each prior . . . collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that: (1) he has good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title." See Continental Bank & Trust Co. v.

15

<u>Peoples Nat'l Bank & Trust Co. of Norristown</u>, 274 A.2d 549 (Pa. Super. Ct. 1970) (per curiam) (Hoffman, J., concurring) (explaining operation of section 4207).

The liabilities for breach of warranty by banks in the collection process is affected by their status. As we view the record before us, York Bank is the depository bank because it was "the first bank to which an item is transferred for collection." 13 Pa. Cons. Stat. Ann. § 4105. It probably is also a collecting bank.

Landmark may be a collecting bank. 13 Pa. Cons. Stat. Ann. § 3120 provides that "[a]n instrument which states that it is `payable through' a bank or the like designates that bank as a collecting bank to make presentment but does not of itself authorize the bank to pay the instrument." <u>See</u> <u>also</u> 13 Pa. Cons. Stat. Ann. § 4105 cmt. 3. ("Items are sometimes drawn or accepted `payable through' a particular bank. . . . [T]he `payable through' bank will be a collecting (and often a presenting) bank; it is not a `payor bank.'"

York, however, contends that Landmark was a payor bank, and as such had more responsibilities than a collecting bank. It appears that determination of Landmark's status will be a significant factor in the resolution of Universal's claims under Article 4 and may require further development on remand.

Landmark's name, appearing as it does in the lower right-hand corner of the draft, creates an ambiguity. Although that location usually identifies a party as the drawer or maker, see <u>Mitchultka v. Grapin</u>, 340 A.2d 576 (Pa. Super. Ct. 1975), it

16

is clear enough that Landmark was not intended to be such. It may be that the uncertainty as to Landmark's status came about because the draft form was prepared by Universal and not the bank.

From our review of the record, including a scrutiny of the face of the items, we conclude that they are, to a substantial degree, akin to "payable through" drafts. Although on their face the drafts do not contain the words "payable through," that lack is not determinative here for two reasons. First, the drafts are not negotiable and, thus, not within the term "instrument" as used in section 3120.[3] Second, at this juncture, the evidence on the practice followed in issuing and paying the drafts corresponds to the "payable through" procedure.

The determination of whether a draft is of the "payable through" variety can be important in determining whether a bank that honors the item is a "payor" or a "collecting" bank. Although some courts have concluded that "payable through" status is determined by examining the face of the draft, they have nonetheless considered evidence on the function that the bank actually performed. See Berman v. United States Nat'l Bank, 249 N.W.2d 187 (Nebr. 1976); Engine Parts, Inc. v. Citizens Bank of Clovis, 582 P.2d 809 (N.M. 1978). The net result is that extrinsic evidence has been used to determine whether a relationship similar to a "payable through" arrangement existed

---

[3]Article 3 is not always consistent in its use of the word "instrument". See Mellinkoff, 77 Yale L.J. at 194-95. It appears, however, that section 3120 uses the term to mean only negotiable items.

17

in fixing a bank's liability.  See Branch Banking & Trust Co. v. Bank of Washington, 120 S.E.2d 830 (N. C. 1961); Phelan v. University Nat'l Bank, 229 N.E.2d 374 (Ill. App. Ct. 1967); Wilhelm Foods, Inc. v. National Bank, 382 F. Supp. 605 (S.D.N.Y. 1974) (distinguished by Horney v. Covington Cty. Bank, 716 F.2d 335 (5th Cir. 1983)).

The argument against the use of extrinsic evidence rests on its possible adverse impact on negotiability.  Whatever may be the merits of restricting review to the face of the drafts to determine the status of the affected parties, that limitation has less weight here because the items are not negotiable.  See Dow, 49 U. Pitt. L. Rev. at 63, 66–81.  Moreover, there is some significance to the fact that before a draft would be honored by Landmark, it had to be accepted by Universal.

On remand, therefore, in determining the status of the parties to the drafts under Article 4, the district court will not be restricted to the face of the items.  Instead, it will be free to consider whatever further evidence it deems necessary.

VII.

In addition to its breach of warranty count, Universal insists that York is liable in conversion.  We note that this claim must be resolved on remand and observe that D & G Equipment Co. v. First Nat'l Bank of Greencastle, 764 F.2d 950 (3d Cir. 1985), discussed a claim for conversion of checks.  We commented that under 13 Pa. Cons. Stat. Ann. § 3419, an instrument is converted when it is paid on a forged indorsement.

18

However, it appears that common law conversion in Pennsylvania may be somewhat broader in scope.  Id. at 957 n.4. In Cenna v. United States, 402 F.2d 168, 170 (3d Cir. 1968), we said that under Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification."

## VIII.

Finally, Universal seeks a recovery based on negligence.  As York points out, when 13 Pa. Cons. Stat. Ann. § 3405 applies, some courts have held that the drafters of Code intended to displace common law negligence actions.  See Law of Bank Deposits ¶ 8.04[8][c]; Brady on Bank Checks, § 31.17 (collecting cases).

In the absence of a holding by an appellate court, we may assume, without deciding, that Pennsylvania would adopt that viewpoint.[4]  However, since we have concluded that section 3405 does not apply here, Universal is free to establish, if it can, a case of negligence against York.

In that connection, York's action in depositing drafts made payable to one company in the account of another should be subject to scrutiny.  See, e.g., Commonwealth Fed. Savings & Loan v. First National Bank of New Jersey, 513 F. Supp. 296, 304 (E.D.

---

[4]In the 1990 revision, the fictitious payee provision formerly in § 3405 was renumbered as § 3404 and provided for imposition of comparative negligence liability.  "In short, this is one area where the drafters of the 1990 UCC completely reversed a rule of the 1962 U.C.C."  Brady on Bank Checks ¶ 31.18 at 31-46.

19

Pa. 1979) ("established banking practice mandates that any check payable to a designated business entity can be accepted for deposit only into the account of such named payee"). Further development of this claim must await the remand.

Accordingly, the judgment of the district court will be reversed and the case will be remanded for further proceedings consistent with this Opinion.