SHERRILL WHITE CONSTRUCTION,
INC., Appellee,

v.

SOUTH CAROLINA NATIONAL
BANK, Appellant.

No. 82–1183.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1983.

Decided Aug. 9, 1983.

Mantor M. Grier, Columbia, S.C. (Boyd, Knowlton, Tate & Finlay, L. Henry McKellar, Associate Gen. Counsel, South Carolina Nat. Bank, Columbia, S.C., on brief), for appellant.

Henry E. Grimball, Charleston, S.C. (Grimball, Cabaniss, Vaughan & Robinson, Charleston, S.C., on brief), for appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WIDENER, Circuit Judge:

South Carolina National Bank (SCNB or bank) appeals the award of $44,747.62 in compensatory damages and $13,400 in punitive damages it was ordered to pay to Sherrill White Construction, Inc. (White Construction) following a jury trial for conversion. We affirm the award of actual damages, but reverse that of punitive damages.

White Construction was a Tennessee corporation involved in carpentry work. The suit involved a construction contract for carpentry work on an apartment building in Charleston, S.C. Sherrill White ran White Construction, and he and his wife were its only officers. Robert Hancock was an employee of White Construction and a supervisor on some of the company's jobs. Hancock had no ownership interest or corporate position with White Construction. During the same time as the Charleston project was being handled, Hancock and White individually entered into a partnership arrangement to perform a drywall job in Mobile, Alabama under the name H & W Drywall. White went to Mobile to supervise that job.

In January 1978, White Construction was awarded a contract by Collegiate Enterprises, the general contractor, to perform the framing and siding on the Ashley Oaks Apartments in Charleston, S.C. Hancock went to Charleston to supervise the Charleston project.[1] White gave Hancock about $12,000 start-up money to get the job going. Part of that money was to be used to pay workmen until the first interim progress payment was made by Collegiate to White Construction. Hancock was to do the hiring at Ashley Oaks, sign the lien waivers, and generally run the Charleston job.

Collegiate had a policy which did not allow the contract to be signed outside its offices in Charleston. Hancock was in Charleston at the time but White was not. Therefore, White gave Hancock authority to sign the Ashley Oaks contract with Collegiate. Hancock signed the contract as "Sherrill White Construction, Inc. by Robert Hancock."

After the contract was signed, start up on the Ashley Oaks job was postponed until April 1978 because of soil conditions. During this delay, Hancock became involved in another construction project at Seabrook Island, S.C. Neither White nor White Construction was involved in this project. The evidence shows that Hancock was still involved in this construction project when Ashley Oaks started up.

The Ashley Oaks contract called for monthly interim progress payments. Because Collegiate had a policy against mailing draw checks, White authorized Hancock to pick up the draw checks after signing a lien waiver. Hancock was to mail these checks to White who had set up a separate account in a Ringgold, Ga. bank for this

---

1. White was in Mobile, Alabama supervising that drywall project.

contract. Hancock had gone to Ringgold with White to set up this account. Both men's signatures were necessary on the Georgia account. Hancock was to send the interim payment checks to White, who in turn would approve the amount of the payment, deposit Collegiate's check, and make a check payable to Hancock or to a subcontractor and place it in the mail. If to Hancock, he would then make the appropriate disbursements.

Without White's knowledge or consent, Hancock arranged with Collegiate to have the monthly payments changed to bi-weekly. When Collegiate began delivering the interim payment checks in early May, Hancock would sign the requisite lien waiver and receive the check. Instead of mailing these checks to White as agreed, Hancock would deposit them into an account he had opened with the Ashley Plaza Branch of SCNB in Charleston.[2]

The SCNB account was opened by Hancock in the name of Continental South, Inc., a fictitious Tennessee corporation. To open the account Hancock had given the bank an incomplete corporate resolution of Continental South,[3] a new national account form for Continental South, and a signature card with Hancock, Vice President of Continental South listed as the authorized signer.[4] White was listed as the president of Continental South on the corporate resolution. His signature did not appear on any of these documents.

Before cashing any of the interim payment checks, Paul Wright, Branch Manager of the Ashley Plaza branch of SCNB, talked to Everette Brewer, Collegiate's regional manager, about Hancock and the Ashley Oaks job. Brewer told Wright that White and Hancock were partners. Wright understood that Hancock was in charge of the Charleston job and could do whatever he chose to.[5]

The interim payment checks deposited into the Continental South account were made payable to White Construction, not Continental South. Hancock endorsed the checks "Sherrill White Construction Inc. Robert Hancock." The bank did not communicate with White or White Construction to find out if Hancock had authority to endorse these draw checks. Nothing in the bank's file indicates such authority.

Between May 6 and June 30, Hancock endorsed for deposit to the Continental South account six checks made payable to White Construction by Collegiate. Those checks were in the total sum of $44,747.62. As Hancock went to the bank to deposit these checks, he would be accompanied by workers with their paychecks. Hancock would endorse the Collegiate check and deliver it to the bank, which, after checking with Collegiate's bank to verify that the check was good, would immediately credit the Continental South account. The bank would then cash the workers' paychecks.

In May, White and Hancock began experiencing problems with the Ashley Oaks job. On May 26, White wrote Brewer seeking to be released from the contract. He stated, incidentally, "as I explained to you Bob [Hancock] does not have authority to cash or deposit any Sherrill White Construction Inc. checks." On May 31, White sent Brewer a telegram saying "please disregard previous letter. Release check to Mr. Robert Hancock." White testified that this telegram was to allow the draw check to be released to Hancock who was then to mail it to White. The bank did not see these

---

2. Neither White nor White Construction ever opened an account in Charleston.

3. The resolution showed Continental South to be a Tennessee corporation located in Fort Oglethorpe, Georgia. The resolution was not signed, neither was it impressed with the corporate seal. A certificate from the Secretary of State of Tennessee showed no record of corporate existence of Continental South.

4. Hancock also sent the bank a copy of the construction contract between White Construction and Collegiate.

5. The bank, however, did not claim in defense that Hancock and White Construction were partners, possibly because the bank's standard operating procedures and tellers manual required a resolution of authority for a partnership similar to that of a corporation, or because the contract was made with White Construction, not a partnership.

communications until after White complained of the unauthorized endorsements in late June. The bank did not rely upon these communications in honoring the endorsements.

White expected the first request for interim payment to be submitted to Collegiate in mid-May. Because the money was to be received from Collegiate's office in Missouri, the contract provided for a 20 day delay in actually receiving payment. By late June, White had discovered that Hancock was endorsing White Construction checks. Once he found out, he went to Charleston but found that Hancock had disappeared taking White's truck and tools. White found unpaid laborers at the Ashley Oaks job site.

White then notified Paul Wright at SCNB. Wright advised him that the bank had a written authorization from White to allow Hancock to cash the checks. When asked to produce it, Wright was unable to locate the written authorization, for, indeed, it did not exist. SCNB never reimbursed White Construction for any of the funds from the six checks. White tried unsuccessfully to obtain a loan from SCNB to complete the Ashley Oaks project, and was unable to complete the project.

White Construction then brought this action for conversion of the six checks by SCNB.[6] The bank defended the action on the ground that Hancock was authorized to endorse the checks, and, even if he was not so authorized, the moneys had been used for their intended purpose, that is to pay workers on the Ashley Oaks job. The jury found for White Construction and awarded both compensatory and punitive damages.

■ We find no merit to the bank's contention that it was entitled to a judgment n.o.v. because Hancock had express, implied or apparent authority to endorse the draw checks. The trial court submitted to the jury the question of all three types of au-

thority,[7] and the jury rejected the bank's claims. We cannot reverse a jury verdict except "when there is a complete absence of probative facts to support the conclusion reached [by the jury.]" *Basham v. Pennsylvania Railroad Co.,* 372 U.S. 699, 700–701, 83 S.Ct. 965, 967, 10 L.Ed.2d 80 (1963), quoting *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). *Hardware Mutual Casualty Co. v. Jones,* 363 F.2d 627 (4th Cir.1966). A review of the evidence finds probative facts to support the jury's verdict. White's testimony that Hancock had no authority to endorse the checks and the absence of any such authorization in the hands of the bank supports the verdict. There was no direct evidence to the contrary, and we think that the jury was not required to accept the circumstantial evidence of any such authority.

■ The bank also contends that there was evidence in the record to show that Hancock and White were engaged in a joint venture and that the jury should have been instructed on the doctrine. A review of the record finds that the district court correctly held that there was no evidence to support such an instruction.

While the bank claims error in the finding of liability, the main thrust of its appeal deals with the award of damages. The bank relied upon the defense of mitigation of damages and claims error in the trial court's refusal to set aside the jury's verdict awarding White Construction the face value of the six checks converted. Both parties relied at trial upon *Yeager and Sullivan Inc. v. Farmers Bank,* 162 Ind.App. 15, 317 N.E.2d 792 (1972), as properly setting out this defense. The trial court correctly charged that mitigation was an affirmative defense and "in a conversion action must establish, that is the defendant must show, that the converted proceeds were applied to

---

**6.** Under the UCC a negotiable instrument is converted when "it is paid on a forged indorsement." S.C.Code 36–3–419(1)(c). In such a case, the measure of damages is presumed to be the face amount of the instrument. S.C. Code 36–3–419(2). Conversion is a recognized

cause of action in South Carolina. *Owens v. Andrews Bank & Trust Co.,* 265 S.C. 490, 220 S.E.2d 116 (1975).

**7.** Error is not claimed in the substance of the charge given.

the specific debt the proceeds were intended to discharge."

In *Conwed Corp. v. First-Citizens Bank and Trust Co.*, 262 S.C. 48, 202 S.E.2d 22 (1974), the South Carolina court noted that while a payee cannot recover from a bank when the proceeds of the converted instrument are used to meet the intended obligation of the check, this rule is inapplicable where the proceeds were not applied to the intended obligation of the check even though the proceeds may have been received by the payee for payment on another account.

The applicable law being clear, the question is whether the bank produced evidence to require the jury to find mitigation of damages. The bank was not able to show that the proceeds of the six checks went to pay off the specific debts for which they were intended. The checks drawn on the Continental South account cannot even be substantially divided by job site. Hancock had at least two construction jobs going in the Charleston area at the same time, the framing job at Ashley Oaks and the Seabrook Island job. Hancock had also entered into a contract under the name of H & W Drywall to do the drywall at the Ashley Oaks site. White testified that he did not know that Hancock had signed a drywall contract for Ashley Oaks. Some of the checks drawn on the account are labeled for Seabrook, others for "1001",[8] and the rest with no indication as to what purpose for which they were written. There is no way from a review of the checks themselves to segregate checks paid for work done at the Ashley Oaks job.

Wright from the bank testified that he recognized some of the men who accompanied Hancock to the bank to cash their payroll checks as being workers he had seen at the Ashley Oaks job site. He did not have a formal list of White Construction employees to refer to as the checks were cashed. He did not testify that they were being paid for work done by White Construction on the Ashley Oaks job.

When Brewer, Collegiate's regional manager, was shown a list of the persons who were issued checks on the Continental South account, he recognized the names of four men who had worked at the Ashley Oaks site. He did not testify that those four men were being paid for work done at Ashley Oaks.

The bank introduced no evidence to show which employees paid out of the Continental South account were actually paid for work done by White Construction at Ashley Oaks. Although this very matter was discussed during the trial, none of the workmen were called as witnesses. This is particularly important since Hancock had another construction project at Seabrook Island. He also had the drywall contract for the Ashley Oaks project. White Construction was not involved in either of those latter two projects. While the bank's evidence may tend to show that some of the moneys may have paid White Construction employees, it is not the only reasonable inference that can be drawn from the facts. It is not an unjustifiable inference that the funds went to pay workers on another job or that the funds were diverted elsewhere. This being so, we must affirm the jury award of compensatory damages.[9]

We must, however, reverse the jury's award of punitive damages against the bank. White Construction is correct in stating that punitive damages may be recovered in conversion cases. See *Rhode v. Ray Waits Motor Inc.*, 223 S.C. 160, 74 S.E.2d 823, 825 (1953). But in order to recover punitive damages there must be more than mere conversion. There must be "malice, ill will, a conscious indifference to the rights of others, or a reckless disregard

---

**8.** There is no testimony in the record explaining what 1001 is. Wright, the bank officer, testified that he did not know what the numbers meant. Brewer from Collegiate also testified that he did not know what 1001 was. 1002 was the drywall contract of H & W, but no work was done on that job.

**9.** The bank likewise contends that it successfully rebutted the presumption that the measure of damages is the face value of the instruments. S.C.Code § 36–3–419(2). For the reasons already given, we disagree.

thereof." *Cox v. Coleman,* 189 S.C. 218, 200 S.E. 762, 763–04 (1939). Upon reviewing the record, we conclude that the only reasonable inference that can be drawn from the facts is that while the bank acted negligently by in effect cashing the checks to White Construction, it did not act maliciously with any intention to injure White Construction, and its conduct was not otherwise conscious or reckless so as to justify punitive damages.

We find no merit to the bank's contention that the award of pre-judgment interest was improper. South Carolina law provides that the measure of damages in conversion cases may include interest upon the value of the property converted. *Long v. Gibbs Auto Wrecking Co.,* 253 S.C. 370, 171 S.E.2d 155 (S.C.1969).

Accordingly, we affirm the judgment upon the jury verdict for compensatory damages and reverse the award of punitive damages. The district court will modify its judgment upon remand.

AFFIRMED IN PART; REVERSED IN PART; and REMANDED.