**D & G EQUIPMENT CO., INC., Appellant,**

**v.**

**The FIRST NATIONAL BANK OF GREENCASTLE, PA., Appellee,**

**v.**

**GEORGION, Roger L., Third Party Defendant.**

**No. 84–5271.**

United States Court of Appeals, Third Circuit.

Argued Nov. 1, 1984.

Decided June 13, 1985.

Dale A. Cooter (Argued), Nicholas H. Hantzes, Cooter & Gell, Washington, D.C., for appellant.

G. Thomas Miller (Argued), McNees, Wallace & Nurick, Harrisburg, Pa., for appellee.

Richard W. Cleckner, Cleckner and Fearen, Harrisburg, Pa., for third party defendant.

Before GARTH and SLOVITER, Circuit Judges, and BARRY, District Judge *.

## OPINION OF THE COURT

GARTH, Circuit Judge.

D & G Equipment Company appeals from a final judgment of the district court holding that the First National Bank of Greencastle ("First National") was not liable as a converter of corporate funds, even though the bank allowed Roger Georgion, a former corporate officer of D & G, to deposit and disburse checks payable to D & G through a personal account opened in Georgion's name, trading as D & G Equipment Co. The district court concluded that Georgion retained apparent authority to act for D & G even after notice of his removal as an officer had been conveyed to the bank by D & G. We reverse.

### I.

D & G Equipment, a Maryland corporation, was formed by a group of ten investors in 1977. D & G engaged in the business of leasing aerial cranes for use in the construction industry. At the time of D & G's formation, Roger Georgion (Georgion) was elected as president of the corporation and charged with responsibility for its operation.[1] For a number of years, D & G maintained a corporate checking account with the First National Bank of Greencastle. Georgion, as president and chief operating officer of D & G, was an authorized signatory on the account.

In late 1981, the shareholders of D & G grew dissatisfied with Georgion's management of the corporation. On December 12,

---

* Honorable Maryanne Trump Barry, United States District Court for the District of New Jersey, sitting by designation.

1. D & G was one of two subchapter S corporations formed to afford its investors a tax shelter. The other such corporation was Coastal Equipment Co. Although Roger Georgion acted as the chief executive officer of both D & G and Coastal, the present action involves only D & G. Georgion, however, was also the principal shareholder in J & M Industries and Brooke Management, corporations engaged in essentially the same business as D & G. See app. at 146.

All the corporations conducted their operations from the same physical location in Hagerstown, Maryland. Certain expenses of all the corporations, such as rent and insurance, were met in single payments which were then prorated among them. See app. at 148. In general, a year-end accounting allocated expenses among the various corporations. As the events of the present controversy occurred in late 1981 and early 1982, no accounting was made to apportion expenses within the time-period at issue. See app. at 196.

1981, the D & G Board of Directors met and voted to remove Georgion from his position as president and chief operating officer. At the same meeting, Henry Donaldson, then vice president of D & G, was named chief operating officer in Georgion's stead. The Directors also agreed that Donaldson would assume the powers of corporate president until a vote for a successor to Georgion was taken. In addition, the Board elected Edward Quinn to the position of assistant treasurer. Both Donaldson and Quinn were then designated as authorized signatories on all bank accounts for the corporation.

On December 13, 1981, Donaldson telephoned First National and spoke to Richard Myers, a vice president. He informed Myers that Georgion had been removed from his positions with D & G and requested that the bank temporarily freeze D & G's account. The following day, Donaldson met with Myers and gave him an original notarized corporate resolution stating Georgion had been removed. Donaldson also gave Myers a new signature card that indicated only Donaldson and Quinn were authorized signatories on the D & G account. The bank accepted delivery of both the corporate resolution and the new signature card.

On December 24, 1981, Georgion opened a new account with First National. The account was designated "Roger L. Georgion, T/A D & G Equipment Co., Inc." and was used by Georgion to deposit checks in his possession payable to D & G. The bank did not notify any D & G shareholders or directors, including Donaldson or Quinn, of the opening of the account. Rather, the bank relied upon the representations of Georgion and his counsel that Georgion's removal was improper and ineffective, that Georgion was therefore still president of D & G, and that Georgion was accordingly authorized to conduct the affairs of the company, notwithstanding any writing to the contrary.

Approximately $31,000.00 in D & G funds was deposited and approximately $29,500.00 was disbursed through Geor-

gion's "trading as" account between December 24, 1981, and January 7, 1982. The payments made by Georgion covered D & G's rent, taxes, and insurance, with the bulk of the funds—over $22,000.00—applied to past due and current insurance premium charges. On January 7, 1982, Donaldson discovered the existence of Georgion's "trading as" account and advised the bank to discontinue processing any D & G funds through the account. The bank thereafter obtained from Georgion a voluntary indemnity agreement, stating Georgion agreed to hold the bank harmless for any actual losses sustained by virtue of opening the account. Transactions through the "trading as" account were suspended shortly thereafter and the account was closed.

D & G commenced this diversity action in the Middle District of Pennsylvania to seek recovery of the disbursed funds. D & G's amended complaint alleged that First National: 1) breached its fiduciary duty to D & G; 2) wrongfully paid Georgion funds belonging to D & G; 3) converted funds belonging to D & G; 4) breached its contract of deposit with D & G; and 5) was negligent in its handling of D & G funds. First National answered denying liability and filed a third party complaint alleging Georgion was liable for any alleged improper disbursement of D & G funds.

After a bench trial, the district court entered judgment in favor of First National and dismissed the third party complaint against Georgion. The court found that Georgion had apparent authority to act on behalf of D & G and that therefore the bank was not liable under any theory of conversion. The court further found that First National had not failed to use ordinary care in permitting the deposit and disbursement of D & G's funds by Georgion. Without deciding whether the intended creditors of D & G were paid, the court found, on the basis of Georgion's testimony, that the monies were used for the benefit of D & G.

We reverse the district court's holding that Georgion retained apparent authority

to act for D & G and that First National was therefore not liable as a converter of corporate funds. We remand to the district court for a determination of the compensatory damages recoverable by D & G and direct that the district court reinstate First National's third party complaint against Georgion.

## II.

■ An initial question in this appeal is whether after December 14, 1981, Georgion retained apparent authority to deposit and disburse corporate funds. The district court's finding that Georgion possessed such apparent authority is a mixed question of fact and law. When a finding is essentially one dealing with the effect of certain transactions or events, rather than a finding that resolves disputed facts, a reviewing court remains free to substitute its judgment for that of the trial court. *See In re Trimble Company*, 479 F.2d 103, 112 (3d Cir.1973). Indeed, this court has stated that "in determining whether the facts as found by the district court constitute apparent authority under Pennsylvania law, we may exercise an 'independent review.'" *William B. Tanner Company, Inc. v. WIOO, Inc.*, 528 F.2d 262, 266 (3d Cir.1975), *quoting United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 325 (3d Cir.1975).

■ Under Pennsylvania law, apparent authority flows from the conduct of the principal and not from that of the agent. Pennsylvania courts define apparent authority as that authority which, although not actually granted, the principal knowingly permits the agent to exercise, or holds him out as possessing. *See Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 246 A.2d 407, 410 (1968); *Jennings v. Pittsburgh Mercantile Co.*, 414 Pa. 641, 202 A.2d 51, 54 (1964). The Restatement (Second) of Agency further defines apparent authority as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third

persons." Restatement (Second) of Agency § 8 (1958).

The undisputed facts of this case establish that D & G explicitly notified First National that Georgion had been removed from his positions with D & G and was no longer to be an authorized signatory on corporate accounts. Georgion contends that the Board's action was defective under the corporate laws of Maryland, the state of D & G's incorporation, and that hence he retained actual authority. At the very least, Georgion asserts he retained apparent authority. This argument, however, mistakes the issue. Whether the Board's actions ultimately conformed to Maryland law cannot determine the effectiveness of the notice given to First National as a third-party.

■ Apparent authority can exist only to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized. *See* Restatement (Second) of Agency § 8, comment c (1958). All of the actions taken by D & G were actions to deny, not to grant, authority to Georgion. D & G's efforts were designed to prevent, not to authorize, Georgion from continuing to use corporate funds.

To allow First National to rely solely upon the statements of Georgion and his counsel as to Georgion's authority to act on behalf of D & G is to enable an agent to create apparent authority by his own representations—a principle rejected by Pennsylvania courts. *See Jennings v. Pittsburgh Mercantile Co.*, *supra* at 54 ("An agent cannot, simply by his own words, invest himself with apparent authority. Such authority emanates from the actions of the principal and not the agent."); *cf.* Restatement (Second) of Agency § 168 (1958) ("A disclosed or partially disclosed principal is not thereby subject to liability because of untrue representations by an agent as to the existence or extent of his authority or the facts upon which it depends.")

That D & G's actions sufficed to terminate Georgion's apparent authority is clear

under existing doctrine and case law.[2] The Restatement provides that if a principal has manifested that an agent is a general agent, the apparent authority thereby created is not terminated *unless* the third person has notice of termination. *See* Restatement (Second) of Agency § 127. Section 135 of the Restatement further specifies that "[a] third person to whom a principal has manifested that an agent has authority to do an act has notice of the termination of authority when he knows, has reason to know, should know, or has been given a notification of the occurrence of an event from which, if reasonable, he would draw the inference that the principal does not consent to have the agent so act for him...." *See also Capetola v. Orlando,* 463 F.Supp. 498, 506 (E.D.Pa.1978) ("where a third party has reason to know authority does not exist, or once having existed has now been revoked, the agent's acts are ineffective and they do not bind the principal."); *Indianapolis Saegner Chor, Inc. v. American Fletcher National Bank & Trust Co.,* 149 Ind.App. 665, 274 N.E.2d 728 (1971) (where corporation informed bank by resolution that named individuals were authorized to deposit and withdraw funds to and from a corporate account and where that resolution was not officially revoked, but second resolution showing change of corporate officers and designating new persons to have authority to do banking was furnished to bank, the bank had sufficient notice that authority of first officers to deposit and withdraw funds was withdrawn).

■ In light of the conflicting representations as to Georgion's status and the clear indications of dissension within the corporation, a sophisticated third party, like First National, had reason to know or to infer that D & G no longer consented to have Georgion act in its behalf. Accordingly, we hold that D & G's actions, in furnishing First National with a corporate resolution removing Georgion as an officer and a new signature card for the corporate account, were sufficient to terminate Georgion's actual and apparent authority.

### III.

### A.

■ Having held that Georgion lacked apparent authority, we are required to decide whether First National committed conversion by permitting Georgion to deposit and disburse corporate funds through Georgion's "trading as" account. As an initial matter, we must thus determine the propriety of Georgion's indorsement on those instruments payable to D & G and negotiated by Georgion trading as D & G.

Section 3–419(1)(c) of the Uniform Commercial Code, 13 Pa.Cons.Stat.Ann. § 3419(a)(3) (Purdon 1984), provides that an instrument is converted when it is paid on a forged indorsement. Although by its terms this section would seem to require an actual forgery as a precondition to liability, section 3–419 has been generally interpreted to impose liability when an instrument is paid upon an unauthorized indorsement as well. *See Aetna Casualty & Surety Co. v. Hepler State Bank,* 6 Kan.App.2d 543, 630 P.2d 721 (1981); *Hartford Accident & Indemnity Co. v. South Windsor Bank & Trust Co.,* 171 Conn. 63, 368 A.2d 76 (1976); *Salsman v. National Community Bank,* 102 N.J.Super. 482, 246 A.2d 162 (1968); *see generally* 6 R. Anderson, Uniform Commercial Code § 3–419 (3d ed. 1984).

Code section 1–201, 13 Pa.Cons.Stat.Ann. § 1201 (Purdon 1984), defines an "unauthorized signature or indorsement" as one "made without actual, implied or apparent authority and includes a forgery." Because First National was chargeable with notice of Georgion's removal as of December 14, 1981, the bank cannot now claim that Georgion's indorsements on D & G checks negotiated between December 24, 1981 and January 7, 1982 were authorized. In the absence of either actual or apparent

---

**2.** With respect to the doctrines mentioned, Pennsylvania in general follows the Restatement. *See, e.g., Jennings v. Pittsburgh Mercantile Co.,* 414 Pa. 641, 202 A.2d 51 (1964); *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407 (1968).

authority vested in Georgion, his signature was no more effective to transfer title to a given instrument than a forgery would have been. First National was thus neither a holder nor holder in due course with respect to those corporate funds credited to the "trading as" account. *See* 13 Pa.Cons. Stat.Ann. § 3302 (Purdon 1984); *see also Aetna Casualty & Surety Co. v. Hepler State Bank,* 630 P.2d at 725; *National Bank of Georgia v. Refrigerated Transport Company, Inc.,* 147 Ga.App. 240, 248 S.E.2d 496, 499 (1978); *Salsman v. National Community Bank,* 246 A.2d at 167. Since payments made on the basis of Georgion's unauthorized signatures clearly interfered with D & G's right to possession of the transferred funds, such payments constituted acts of conversion. We therefore reject the district court's conclusion that Georgion's retention of apparent authority shielded First National from liability for conversion.

### B.

■ Nor do we believe that First National is entitled to limit its liability by means of the defense set forth in 13 Pa.Cons.Stat. Ann. § 3419(c).[3] That section limits a plaintiff's recovery to the amount of any proceeds remaining in the hands of a representative guilty of conversion if the representative dealt with the instrument "in good faith and in accordance with the reasonable commercial standards" of the representative's business. The exception contained in § 3419(c), an affirmative defense which the bank bears the burden of proving, requires that both the good faith and the commercial reasonableness of the representative's actions be independently established. *See National Bank v. Refrigerated Transport Co.,* 248 S.E.2d at 499; *Belmar Trucking Corp. v. American Trust Co.,* 64 Misc.2d 31, 316 N.Y.S.2d 247

(1970). As a matter of law, however, we cannot conclude First National's actions were commercially reasonable.

■ In the absence of exceptional circumstances, the failure of a bank to inquire when an individual presents a check made payable to a corporate payee for deposit to his personal account is deemed an unreasonable commercial banking practice as a matter of law. *See, e.g., Hermetic Refrigeration Co., Inc. v. Central Valley National Bank, Inc.,* 493 F.2d 476 (9th Cir. 1974); *Aetna Casualty and Surety Co. v. Hepler State Bank,* 630 P.2d at 728; *National Bank v. Refrigerated Transport Co., supra.* The obviously contradictory positions of D & G and Georgion cannot be treated as exceptional circumstances which relieved First National of its normal duty to make further inquiries as to Georgion's continued authority. Indeed, as we have stated, to allow the bank to rely upon the statements of Georgion is to enable an agent to invest himself with authority. Prior to the opening of the "trading as" account, D & G clearly notified First National that Georgion was no longer authorized to handle corporate funds. Commercial reasonableness, as well as common sense, would dictate that a bank in First National's position was required to make additional inquiries of D & G as to the accuracy of Georgion's representations. Accordingly, we reject First National's argument that it has established its entitlement to the limitation of liability provided by § 3419(c).

We hold that Georgion lacked apparent authority to act on behalf of D & G and that First National's receipt of corporate funds without a proper indorsement and the crediting of those funds to Georgion's

---

**3.** 13 Pa.Cons.Stat.Ann. § 3419(c) provides:

(c) **Limitation on liability of representative.** —Subject to the provisions of this title concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applica-

ble to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

personal account were acts of conversion for which the bank must assume liability.[4]

## IV.

The sole issue remaining in this appeal is the question of damages. The Uniform Commercial Code, as adopted in Pennsylvania, provides that when a claim of conversion is brought against a collecting bank the measure of liability is presumed to be the face amount of the instruments converted. *See* 13 Pa.Cons.Stat. Ann. § 3419(b).[5] D & G accordingly argues that in the absence of evidence overcoming this presumption, it is entitled to recover the face value of the converted instruments or $29,542.75 as compensatory damages.[6] In response, First National contends that even if a conversion occurred, no harm has been sustained by D & G since payments on Georgion's unauthorized indorsements were made to corporate creditors. First National thus argues that the presumption embodied in § 3419(b) is overcome and that a defense of mitigation of damages should apply.

At the outset, we note that the Code provisions appropriately supply the measure of damages in the present case, because Georgion's unauthorized signatures were to all intents and purposes the equiva-

4. D & G's amended complaint alleged that First National breached its fiduciary duty to D & G, wrongfully paid Georgion D & G funds, converted D & G funds, breached its contract of deposit with D & G, and was negligent in handling D & G funds. The arguments and briefs before this Court were primarily confined to the question of whether First National was liable to D & G on any statutory or common law theory of conversion.

The liberal interpretation accorded UCC § 3–419 provides that the specific examples of conversion enumerated in § 3–419—nonreturn, nonpayment, or forged indorsement—are not treated as the exclusive instances of conversion of commercial paper. Rather the decisional law acknowledges that non-Code law governing conversion of property may apply to commercial paper in situations not expressly included in the Code. *See, e.g. Salsman v. National Community Bank*, 246 A.2d at 168 ("if the Uniform Commercial Code fails expressly to include unauthorized indorsements other than forgeries in this conversion section, the law may reach the same result by implication from the Code and by general principles."). In effect, the common law of conversion is allowed to supplement the Code when appropriate. This interpretation is consistent with Code section 1–103, 13 Pa.Cons. Stat.Ann. § 1103 (Purdon 1984), which provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant ... or other validating or invalidating cause shall supplement its provisions."

We need not therefore separately address whether First National is liable under distinct common law and statutory theories of conversion. For the purposes of this appeal, section 3–419 may be deemed to encompass the common law conversion that results from payment on an unauthorized indorsement. Our conclusion that First National is liable thus necessarily subsumes a conclusion that a common law conversion, defined under Pennsylvania law as the

"deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification," *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir.1968), also occurred. Nor need we consider First National's possible liability on the basis of D & G's alternate claims, since our conclusion that conversion took place establishes liability.

5. 13 Pa.Cons.Stat.Ann. § 3419(b) provides:

(b) **Measure of liability.**—In an action against a drawee under subsection (a) [acts constituting conversion], the measure of the liability of the drawee is the face amount of the instrument. In any other action under subsection (a), the measure of liability is presumed to be the face amount of the instrument.

6. We note that the amount of damages D & G seeks on appeal is somewhat less than the total amount of funds deposited in the "trading as" account. Although D & G's amended complaint alleges that First National improperly allowed Georgion to deposit $30,912.75, the complaint also alleges that $29,542.75 was disbursed by Georgion. App. at 313–19. The parties do not presently dispute that at least $29,542.75 was deposited and disbursed through Georgion's personal account.

D & G also seeks to recover punitive damages. Mere conversion, however, will not alone entitle a plaintiff to punitive damages. There must be some additional showing that the bank's conduct stemmed from malice, conscious indifference to the rights of others, or reckless disregard of such rights. *See Sherrill White Construction, Inc. v. Carolina National Bank*, 713 F.2d 1047, 1051–52 (4th Cir.1983). Although First National's actions may have been lacking in prudence, D & G has failed to establish that the bank's actions resulted from malice, indifference, or recklessness. Accordingly, D & G's claim for punitive damages will be denied.

lents of forgeries. Thus, the general theory of the Code—that the loss occasioned by a forged instrument be placed upon the party who first dealt with the forger, absent negligence on the part of the drawer or payee—applies to this dispute. D & G is therefore entitled to the presumption that its loss incurred is the face amount of the instruments, unless evidence to the contrary exists.[7] *See* 13 Pa.Cons.Stat.Ann. § 1201 (Purdon 1984).

The question which we are required to decide is whether, as a matter of law, First National may be deemed to have met its burden of proving the affirmative defense of mitigation of damages by adducing proof that Georgion applied the converted funds to discharge debts of D & G. The unauthorized payments which Georgion testified he made on behalf of D & G were primarily for rent, taxes, and insurance premiums. Although the district court's finding of nonliability did not require it to address the question of damages, the court nonetheless concluded that the payments, which Georgion claimed to have made to D & G's creditors, would have mitigated any damages for which First National could have been held liable. We disagree.

Although benefit to the corporation may be found where outstanding debts are discharged, the defense of mitigation should apply only where payment is made to those creditors that the corporation would have specifically designated. *See Sherrill White Construction, Inc. v. Carolina National Bank,* 713 F.2d 1047 (4th Cir.1983). To accept a less stringent rule, one which allowed mitigation upon *any* showing of payment of a debt belonging to the rightful owner of converted funds, would enable the converter to decide how the rightful owner's property should be used. Other courts, confronted by claims that any payment of a debt benefiting the plaintiff should entitle a defendant to a defense of mitigation, have held that the converted proceeds must be applied to the specific debts for which they were intended. *See Sherrill White, supra; Yeager and Sullivan, Inc. v. Farmers Bank,* 162 Ind.App. 15, 317 N.E.2d 792, 799 (1974); *Conwed Corp. v. First-Citizens Bank and Trust Co.,* 262 S.C. 48, 202 S.E.2d 22, 24 (1974).

Our holding that a successful defense of mitigation requires proof by a preponderance that converted funds were used to discharge the legitimate and intended debts of the plaintiff is not in conflict with the measure of liability established by section 3419(b) of the Pennsylvania Code. That section sets forth a dual standard of liability for acts of conversion. In the case of a drawee bank, absolute liability is imposed in the full face amount of the instruments converted. In all other instances, liability is only presumed to be in the face amount of the instruments. *See, supra* at note 5. Accordingly, a bank, such as First National in this case, which is a *collecting* bank *vis a vis* D & G, is not absolutely liable for the face amount of the converted checks as a drawee bank would be, but is rather entitled to rebut its presumed absolute liability. Indeed, when it is remembered that the Pennsylvania Code specifically states that principles of equity are to supplement its provisions, *see* 13 Pa.Cons. Stat.Ann. § 1103 (Purdon 1984), *supra* at note 4, a defense of mitigation may be implied in those instances where a bank's absolute liability is only presumed and thus may be rebutted.

The Pennsylvania Code, however, fails to specify the level of proof needed to establish a defense of mitigation. Nor has our independent research disclosed any Pennsylvania precedents which consider this particular question of Code interpretation. As a federal court sitting in diversity, we are therefore required to predict the rule the Supreme Court of Pennsylvania would adopt were it confronted with the present

---

**7.** Even if the instant case were deemed purely a matter of non-Code conversion of commercial paper, the measure of damages would be much the same. In non-Code cases, "the measure of damages is the value of the instrument when converted which will be assumed to be the face amount of the instrument until otherwise shown." 6 R. Anderson, Uniform Commercial Code § 3–419:38 at 439 (1984).

issue. *See National Surety Corp. v. Midland Bank,* 551 F.2d 21 (3d Cir.1977).

We believe the Pennsylvania Supreme Court would hold that a claim by a defendant bank that converted funds had been generally applied to the benefit of a plaintiff, can not, without more, suffice to make out a defense of mitigation. As stated, a converter should not be given wide latitude to dictate to the rightful owner of converted funds how those funds should be applied. In common law contexts, it is a general rule of damages that a tortfeasor cannot diminish the amount of a plaintiff's recovery by paying a plaintiff's debt without the consent of the plaintiff. *See* Restatement (Second) of Torts § 923.

■ In the absence of some evidence that the debts discharged by a converter were those debts to whose payment the plaintiff would have consented, the initial presumption of absolute liability embodied in 3419(b) should not be deemed overcome. A depositary or collecting bank, which seeks to establish a defense of mitigation by virtue of payment of the plaintiff's debts, must therefore offer proof that the converted monies were used to discharge the specific debts which the plaintiff would have elected to pay at the time the conversion occurred. If the burden of proof thus imposed on the defendant is heavy, it does no more than reflect a salutary principle of the law of damages which we do not believe the drafters of the Code intended to displace.[8] Should the defendant bank be unable to meet its burden of proof by a preponderance of evidence, the presumption of absolute liability will not have been rebutted. The plaintiff will then be entitled to recover the full face amount of the converted instruments. *See Sherrill White, supra,* 713 F.2d at 1050–51.

■ In the instant case, Georgion testified on behalf of the bank that he had used the funds processed through the "trading as" account to discharge debts of D & G. Donaldson, who replaced Georgion as chief operating officer and later as President of D & G, testified that the corporation would not have applied the converted monies to the particular debts Georgion discharged, but rather would have reinvested those funds in equipment maintenance in order to continue operations. App. at 214–15.

A review of the payments made discloses that most of the funds (in excess of $22,-000.00) were applied to insurance premium charges, of which $9,232.72 was used to reimburse J & M Industries for D & G's pro rata share of premiums paid, (App. at 167–68, 171, 274) while $7,293.00 was used to purchase insurance in January, 1982 for *all* the corporations which were operated from the Hagerstown location, including those in which Georgion was a principal shareholder. (see note 1, *supra*). App. at 280.

Under the circumstances, it is far from clear that these payments benefited D & G

**8.** The official comment to section 3419(b) does not illuminate the precise burden of proof to be borne by a defendant who claims a defense of mitigation. The comment states:

4. Subsection (2) is new. It adopts the rule generally applied to the conversion of negotiable instruments, that the obligation of any party on the instrument is presumed, in the sense that the term is defined in this Act (Section 1–201), to be worth its face value. Evidence is admissible to show that for any reason such as insolvency or the existence of a defense the obligation is in fact worth less, or even that it is without value. In the case of the drawee, however, the presumption is replaced by a rule of absolute liability.

Presumably, in accordance with section 1103 (principles of law and equity to supplement Code provisions), the general rule of damages announced in Restatement (Second) of Torts § 923 would not be supplanted in the present circumstances.

We note that in discussing the provisions of U.C.C. § 3–419, the commentators have differed in their explication of the liability of collecting banks. Hart and Willier seem to suggest that in the event a depositary or collecting bank is unable to limit its liability pursuant to § 3–419(3), the exculpatory provision, liability should be absolute. *See* 2 F. Hart & W. Willier, Bender's Uniform Commercial Code § 12.37[3] (1985). In contrast, Clark argues that application of converted funds to any debt of the plaintiff should suffice to raise a defense of mitigation. *See* B. Clark, the Law of Bank Deposits, Collections and Credit Cards, ¶ 6.4[5][c] at 6–68 (1981).

or were applied to the debts which D & G intended to pay. In light of Donaldson's testimony, the payments made by Georgion clearly differ from the disbursements that D & G would have made. We are unprepared to hold that a collecting bank may establish an affirmative defense mitigating its damages merely by showing that in the unauthorized disbursement of corporate funds, payments were made to corporate creditors whom the corporation itself would not necessarily have elected to pay.

Because the district court was not required to face this issue and thus made no findings as to whether, and to what extent, payments made by Georgion benefited D & G and were payments which D & G would have made itself had no conversion taken place, we are obliged to remand to the district court so that the necessary findings of fact may be made to establish the precise amount of the damages incurred by D & G.[9] Moreover, a remand, in any event, would be required because the district court, after holding that First National was not liable to D & G, dismissed First National's third-party claim against Georgion. Now that we have reversed the district court's liability holding, the district court will once again be required to address First National's third-party claim.

On remand, D & G, like any other plaintiff in a conversion action, must prove the value of its actual loss. D & G, of course, will have the continued benefit of the presumption that the bank is liable in the face amount of the instruments converted. On the other hand, First National will bear the burden of proving not only that the converted funds were applied to a legitimate debt of D & G, *see* B. Clark, The Law of

Bank Deposits, Collections and Credit Cards, ¶ 6.4[5][c] at 6–68 (1981), but also that the payments made by Georgion on D & G's account were the payments made by Georgion on D & G's account were the payments that D & G itself would have made at the time Georgion discharged the particular debt. *See Sherrill White, supra* at 713 F.2d at 1051.

V.

In sum, we hold that after December 14, 1981, Georgion lacked both actual and apparent authority to deposit and disburse D & G funds, that First National converted corporate funds by allowing Georgion to open and use the "trading as" account, and that as a matter of law First National must assume liability and respond in damages to D & G for First National's acts of conversion.

We therefore will reverse and remand to the district court for those findings of fact necessary to determine the amount of compensatory damages due D & G. We will further direct that First National's third party complaint against Georgion be reinstated.

---

**9.** The operating arrangements of the corporations which shared the Hagerstown location make it particularly necessary that the district court conduct adequate fact-finding with respect to damages. It is undisputed that D & G and the other corporations, including those of which Georgion was a principal, had many common creditors. Moreover, all the corporations allocated expenses on the basis of a year-end accounting, an accounting which was not completed for the period at issue. The evidence of record is inadequate to allow a general conclu-

sion that Georgion's payments benefited D & G. Indeed, Georgion's purchase of insurance for D & G in January 1982 suggests that he *created* additional corporate debts at a time when he clearly lacked authority to do so. We note that an accounting of intercompany transactions has been undertaken with respect to other and separate litigation pending between D & G and Georgion. If possible, the district court should have the benefit of such an accounting to aid in its calculation of damages in the present controversy.