882

John FAY, Jr., Plaintiff,

v.

Joseph M. RYAN, Superintendent, SCI Dallas, Defendant.

Civ. A. No. 90–153J.

United States District Court, W.D. Pennsylvania.

Feb. 10, 1993.

John Fay, Jr., pro se.

Dennis Kistler, Office of Atty. Gen., Pittsburgh, PA, for defendant.

## MEMORANDUM ORDER

D. BROOKS SMITH, District Judge.

In late July, 1990, plaintiff John Fay, Jr., submitted a *pro se* civil rights complaint al-

leging that his Eighth Amendment and Fourteenth Amendment rights were being violated by the Pennsylvania State Police, the Pennsylvania Department of Corrections, Somerset County and Bedford County, Pennsylvania, the warden and deputy warden of the Somerset County Jail, the warden of the Bedford County Jail, the commissioner of the Pennsylvania Department of Corrections and the superintendent of the State Correctional Institution at Dallas, Pennsylvania. Plaintiff's complaint had two general themes: first, that in March, 1989, he volunteered to do undercover work for the Pennsylvania State Police in exchange for which he was promised that he would be confined in a county prison rather than a maximum security state prison and that he would be allowed furloughs or work release; and, second, that not only did he not receive the benefits he had been promised, he had been exposed to such mistreatment after his undercover assignment was completed that it constituted cruel and unusual punishment.

### History of the Case

The Bedford County defendants and the Somerset County defendants filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), which were granted. Memorandum Order of July 17, 1991. After the Marshal served the Pennsylvania State Police, that defendant filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), which was granted. Memorandum Order of August 31, 1992.

The parties were ordered to complete discovery and were required to file pretrial statements on or before July 1, 1992, listing each party's proposed witnesses and providing a brief description of their testimony. Plaintiff complied; defendant Ryan did not provide a description of his proposed witnesses' testimony. The matter was tentatively scheduled for trial in the fall of 1992, but was continued due to defendant Ryan's counsel's other trial commitments. Defendant Ryan was thereafter granted leave to file a motion for summary judgment concerning plaintiff Fay's claim that defendant Ryan in his personal capacity was liable for any Eighth Amendment violation. Memorandum Order of October 27, 1992. At the same time, I cautioned plaintiff that the issue of his general conditions of confinement in various state prisons was not before the Court. *Id.*, at 3, n. 2. Plaintiff responded by filing a motion to amend his complaint, docket no. 56, later withdrawn, docket no. 59.

Upon consideration of defendant Ryan's motion for summary judgment, I determined that there was no genuine dispute of fact relevant to plaintiff Fay's claim that defendant Ryan was personally responsible for any Eighth Amendment violation alleged in his complaint, and entered summary judgment in favor of defendant Ryan. Memorandum Order of December 16, 1992.

The Department of Corrections thereupon moved to dismiss the remainder of plaintiff Fay's complaint for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and for insufficiency of service, Fed.R.Civ.P. 12(b)(5). Docket no. 62. Notably, the Department of Corrections briefed the issues of subject matter jurisdiction and sufficiency of process, but did not challenge Fay's allegations and relegated the entire discussion concerning the failure to state a claim to a footnote. *See* Brief, docket no. 63, at 3, n. 1. I denied the motion to dismiss. Memorandum Order of December 16, 1992. I pointed out that the Department of Corrections was not a party in this matter, but that under the legal fiction established by *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), relief could be ordered against defendant Ryan in his official capacity as an official of the Department of Corrections. Therefore, although the Department of Corrections' objections to subject matter jurisdiction and service as to the Department of Corrections were well taken, they did not alter the scope of this action or this Court's jurisdiction. *See* Memorandum Order of December 16, 1992. In fact, I had not ordered service on the Commissioner of the Department of Corrections or the Department of Corrections itself at the beginning of this matter, *see* Memorandum Order of August 9, 1990, precisely because they were both not subject to the jurisdiction of this Court and redundant of defendant Ryan's presence.

The matter was accordingly in a posture for trial on the remaining claim for injunctive relief, and the parties were again ordered to provide updated witness lists with proffers of their expected testimony. Plaintiff responded, docket no. 66, by listing witnesses whose testimony related only to the lawsuit plaintiff states, docket no. 65, that he intends to file. Defendant Ryan responded, docket no. 67, by listing witnesses without a proffer of their expected testimony. In response to each party's objection to the other's witness list, I imposed sanctions on the defendant and advised plaintiff that I would not order the issuance of process for the attendance of his irrelevant witnesses. Docket no. 70.

This matter was tried on February 4, 1993. Plaintiff presented his own testimony and certain documents, chiefly newspaper articles. Although I denied defendant Ryan's motion to reconsider the sanction imposed by the Memorandum Order of January 21, 1983, I did ask counsel to proffer what the defendant's witnesses would testify to if he were allowed to present testimony. Counsel proffered only the testimony of Superintendent Ryan. Counsel for defendant also moved for judgment on partial findings, Fed.R.Civ.P. 52(c), which I took under advisement. I enter the following findings of fact and conclusions of law:

*Facts:*

In 1989, plaintiff John Fay, Jr. was serving a 15–35 year aggregate sentence for a second degree murder committed in about 1973 in Cambria County and an armed robbery committed in about 1984 in Somerset County. Fay was incarcerated at S.C.I. Dallas, a maximum security institution, because of the seriousness of his crimes and because he had escaped from prison twice before and was considered an escape risk. In March, 1989, Fay was temporarily being held in the maximum security area of the Somerset County Jail pending a hearing on a PCRA petition, 42 Pa.C.S. § 9541 *et seq.*, attacking his armed robbery conviction, when he came into contact with James Perkowski and Ed Rasanen. Perkowski and Rasanen had recently been arrested and were being held for trial in Somerset County after a cross-state crime spree that had begun with an armed robbery

outside of Philadelphia and ended with an armed robbery at the Somerset Holiday Inn.

Perkowski and Rasanen, in their early 20's, approached Fay, now 49, and asked if he wanted to escape with them. It transpired that the two had associates outside of prison, particularly one Thomas Hill, who were planning to assist Perkowski and Rasanen by kidnapping Ronald Delano, the Sheriff and Warden of Somerset County and his wife, and using them as hostages to free Perkowski and Rasanen. After freeing the two, the conspirators planned to kill the hostages.

Fay contacted John Mastillo, the deputy warden/deputy sheriff on duty at the Somerset County Jail the next morning and related the existence of the proposed escape plan. Mastillo contacted Delano who conferred with officers of the Pennsylvania State Police stationed at the Somerset barracks.

Fay was taken to the Somerset barracks to meet with the Pennsylvania State Police. The officers of the Pennsylvania State Police, a Lieutenant Hackenberg, a Corporal McGarvey, and a trooper named Purcell who headed the undercover unit, proposed that Fay attempt to learn more about the details of the escape plan by pretending to join Perkowski and Rasanen. Fay agreed to attempt to introduce Purcell into the conspiracy by representing that Purcell was an associate of Fay's who would assist in the escape.

Although Fay's initial contact with Mastillo and his agreement to assist the Pennsylvania State Police preceded any discussion of reward, when the dangers of Fay's role were discussed and when Fay pointed out that he was placing himself in great danger, Lieutenant Hackenberg said that Fay "could stay on at Somerset County as a trusty," and in general terms assured him of other benefits, such as work release and furloughs. Trooper Purcell also stated that "if this thing works, I'll personally take you home for a 48–hour furlough."

The undercover operation went smoothly, and approximately three weeks later, Hill and other confederates were arrested. Fay was transferred for security reasons to the small and antiquated Bedford County Jail in the county immediately to the east of Somer-

set County. Fay alleged that one of the prison trusties already knew about his undercover work and "worked him over" and threatened to let other prisoners know about his undercover work unless he paid the trusty money. Fay admits that he did not need any medical attention as a result of his encounter with the trusty, but because he was concerned about the potential for violence against him at the Bedford County Jail, he escaped the next morning with seven other inmates. Fay attempted to contact the state police to protect himself, and turned himself in on the day he escaped. In the news releases surrounding the media excitement over the escape of eight prisoners from the county jail, Sheriff/Warden Max Norris of Bedford County related that Fay had worked undercover at the Somerset County Jail. As a result, Fay contends the prisoners in the cell he was in assaulted him, cracking one of his ribs, until a guard whose name Fay could not recall rescued him.

Fay remained in the Bedford County Jail approximately one week more, and was returned to the Somerset County Jail after Hill, Perkowski, and Rasanen were removed to more secure locations. The stay at the Somerset County Jail was brief, however, and Fay was taken back to S.C.I. Dallas. In December, 1990, Fay was transferred to S.C.I. Pittsburgh.

Fay received a letter in 1990 from a deputy director of the Department of Corrections, Erskind DeRamus, which asserted that the Department was not bound by any promise allegedly made by the Pennsylvania State Police. Additionally, Fay was charged in Bedford County with escape, 18 Pa.C.S. § 5121, was convicted, and received the maximum 3½–7 year sentence consecutive to his other sentences. *Id.*, § 5121(d)(1). His minimum date on the aggregate 18½–42 year sentence is 1998, of which he has served about one-half. Fay's maximum date is 2018.

*Discussion:*

■ The notable distinction between the trial of this matter and almost every other prisoner civil rights complaint in my experience is that the Commonwealth did not seriously dispute the facts as Fay alleged them, nor seriously attempt to contradict the proof of those facts at trial. Defendant Ryan did not even list as witnesses the state troopers who allegedly made the contractual promises to Fay. Defendant Ryan relies on one legal and one equitable defense to Fay's claim. As a matter of law, Ryan asserts that because he was not a party to the promises made by the Pennsylvania State Police, nor authorized them, nor ratified them, he therefore cannot be bound by them.[1] As a matter of equity, Ryan asserts that because Fay is a dangerous prisoner with an admitted history of escapes from less secure facilities, any agreement to reduce his confinement status would be void as against public policy. *See generally* Dobbs, *Remedies* § 13.5, Remedies for Benefits Conferred under Illegal Contracts.

*Conclusions of Law*

*Section 1983 claim*

By more than a preponderance of evidence, I find that officers of the Pennsylvania State Police promised Fay a specific benefit, namely transfer to a lower security institution such as the Somerset County Prison, in exchange for the assistance Fay offered in working undercover to flush out the kidnapping plot. Despite the argument raised by Ryan in his cross-examination of Fay that mention of reward in the discussions of the Somerset barracks came after Fay had agreed to work undercover and therefore constituted an unbargained-for promise, I conclude that, assuming the officers had the capacity to form a contract, the negotiations led to a binding bilateral executory contract.

The threshold question confronting a federal court in addressing Fay's claim under Section 1983, however, since there is no question of the existence of state action, is wheth-

---

1. Additionally, Ryan asserts that because Fay is no longer at S.C.I. Dallas, no injunctive relief can be ordered against him. This argument is not well-founded, however, because if the agreement is to be enforced, it would be enforced by whatever prison official has custody of Fay at the time of judgment, and Rule 25(d) permits the substitution of that official for Ryan even at the time of judgment. *See* Fed.R.Civ.P. 25, Notes of Advisory Committee, 1961 Amendment.

er plaintiff alleges the violation of a federal constitutional or statutory right. *See e.g. Siegert v. Gilley,* —— U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11, 18 (3d Cir.1989), *aff'd,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991).[2]

Is a post-sentencing contractual obligation imposed on state officials a right, privilege, or immunity secured by the Constitution or federal law? The law on the subject is scant, with the majority of courts which have considered the general question holding that simple contract formation with state actors does not implicate the Constitution. *See Downtown Auto Parks, Inc. v. Milwaukee,* 938 F.2d 705 (7th Cir.1991); *Medical Laundry Services v. Trustees of University of Alabama,* 906 F.2d 571, 593 (11th Cir.1990) (citing Judge Roney's dissent in *Medical Laundry Services v. University of Alabama,* 840 F.2d 840, 843 (11th Cir.1988); *S & D Maintenance Co., Inc. v. Goldin,* 844 F.2d 962, 966–67 (2d Cir.1988). Without extensive analysis, one court has assumed constitutional immunities from prosecution to be implicated in contractual promises by law enforcement officers in the course of the investigation of crime. *Arkebauer v. Kiley,* 751 F.Supp. 783 (C.D.Ill.1990).

The bulk of the decisions discussing specific performance of the typical law enforcement officer/criminal defendant contract, i.e., a plea bargain, are federal prosecutions not directly relevant to the legal issue in question, *see United States v. Martin,* 788 F.2d 184, 187 (3d Cir.1986); *United States v. Brody,* 808 F.2d 944, 947 (2d Cir.1986), because the federal government is by definition restrained by federal law. However, the Supreme Court decision which is the foundation for most of the federal decisions, *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), although it involved a state court agreement, was before the Court on direct review. The Court's decision on the merits must therefore have assumed without discussion that the due process clause of the Fourteenth Amendment re-

quired state prosecutors to live up to their bargains, or the matter would have had to have been dismissed as resting on independent state law grounds. *See e.g. Michigan v. Long,* 463 U.S. 1032, 1038 n. 4, 103 S.Ct. 3469, 3475 n. 4, 77 L.Ed.2d 1201 (1983).

The unexamined underpinnings of *Santobello* and the unique facts of *Arkebauer* are fragile bases for extending the reach of Section 1983 to additional areas of contract with law enforcement officers. The federal system is straining with the onslaught of state prisoner cases as it is, *see* Doumar, Prisoners' Civil Right Suits, 11 George Mason L.Rev. 1 (1988), and the doctrinal extension of *Santobello* which Fay must argue to obtain relief under Section 1983 would result in a massive shift of workload from the state administrative and judicial systems to the federal courts.

■ Additionally, the trend in modern analysis of prisoner claims for non-systematic tort law violations by state officials in the prison setting indicates a preference for letting the state courts deal with areas of law not committed by the text of the Constitution to the federal courts. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) *overruled in part* by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1984); *Hudson v. Palmer,* 468 U.S. 517, 534–36, 104 S.Ct. 3194, 3204–05, 82 L.Ed.2d 393 (1984). No jurisprudential reason exists not to apply that analysis to simple breaches of contract.

■ I hold that no Section 1983 claim is stated by plaintiff. If on appeal the Court of Appeals decides either that Section 1983 is implicated by the type of contractual promise at issue in this case, or that Fay has pleaded a pendent state law breach of contract claim, the analysis of Fay's right to recover would be tantamount to resolving a state law contract action involving a request for specific performance. I therefore turn to that analysis.

---

**2.** That threshold question assumes substantial importance in this case because Fay has pleaded only a violation of the federal constitution and has alleged no pendent state breach of contract

claims. However, out of an abundance of caution, I will analyze Fay's action as if he had raised a pendent state claim as well.

## State law claims

There is no question that there was offer and acceptance, consideration, and on Fay's side, performance of the agreement made in March, 1989. The only issue to be resolved in deciding whether the agreement was a contract is the capacity of members of the state police to form a contract binding on the Department of Corrections.

### Agency

Under Pennsylvania law, a principal is bound by the contracts made by its agents acting within their authority. Restatement of Agency, 2d, § 144, § 186. *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987), *app. denied*, 518 Pa. 627, 541 A.2d 1138 (1988). In the instant matter, however, there is little dispute that the officers of the Pennsylvania State Police were not the authorized agents of the Department of Corrections. The Department of Corrections, in fact, could not as a matter of state law delegate authority to the Pennsylvania State Police to make the kind of promise at issue in this matter. *See* 37 Pa.Code. § 93.11(a) ("No inmate shall have a right to be housed in a particular institution or in a particular area within an institution.")

### Apparent Agency

Under Pennsylvania law, even if the officers of the Pennsylvania State Police are not the agents of the Department of Corrections, they may have bound the Department if they were apparently authorized to make an agreement with Fay in March, 1989. Restatement of Agency, 2d, § 159. *See also id.*, § 194. Apparent authority, however, is a power "arising from and in accordance with the [principal's] manifestations to [third parties]." *Id.*, § 8. Here, the Department of Corrections did not in any way convey to Fay the impression that the Pennsylvania State Police were authorized to act for them.[3] *See D & G Equipment Co. v. First Nat'l Bank of Greencastle*, 764 F.2d 950, 954 (3d Cir.1985).

Nor did the Department of Corrections fail to indicate to Fay that they did not acquiesce in or ratify the actions of the state police. *See Gordon L. Brown Associates v. Charnita, Inc.*, 329 Pa.Super. 325, 478 A.2d 491, 492 (1984). Although the individual members of the state police assured Fay that he had an agreement with them, they had no power to bind the Department of Corrections. Whether their error resulted from deception or inadvertent mistake, or even if they sincerely attempted to fulfill their end of the bargain, there was no contract binding on the Department of Corrections.

### Conclusion

I am constrained to comment that regardless of the legal niceties, Fay voluntarily risked his life to save several other persons from potentially serious harm or death, and the Department of Corrections, as a branch of the same government as the Pennsylvania State Police, owes Fay a moral debt to consider easing the burdens on his confinement. On the facts of this case, even if Fay were entitled to relief, I would consider it void as against public policy to enforce a contract calling for his transfer to a less secure institution. There are, however, less restrictive classifications within the very state prison where Fay is now confined that can and should be considered.

Judgment is entered for the defendant. Plaintiff shall file any notice of appeal to this order or to the previous orders dismissing his action against defendant Ryan, the Pennsylvania State Police, and the county defendants within 30 days of the entry of judgment. *In forma pauperis* status, if requested, is continued on appeal. The Clerk shall mark this matter closed.

---

3. Fay may argue that because he was in the custody of the Somerset County Jail, Warden Delano and Deputy Warden Mastillo were agents of the Department of Corrections, and that Delano and Mastillo, by accepting the undercover plan launched by the state police, implicitly authorized the state police to act for them and for their ultimate principal, the Department of Corrections. Although colorable, this argument is simply too tenuous a basis on which to grant relief.